James Jonathan MAPP et al.

v.

The **BOARD OF EDUCATION OF** the **CITY OF CHATTANOOGA, HAMILTON COUNTY, TENNESSEE,** et al.

Civ. A. No. 3564.

United States District Court,
E. D. Tennessee, S. D.

July 26, 1971.

Avon N. Williams, Jr., Nashville, Tenn., for plaintiffs.

Raymond B. Witt, Jr. and John T. Henniss, Eugene Collins, Ellis K. Meacham, Chattanooga, Tenn., for defendants.

Humphreys, Hutcheson & Moseley and Richard P. Jahn, Chattanooga, Tenn., for intervening plaintiffs Oscar Earl Cook, III, Samuel H. Jones, Jr., Frank E. Bruning, and Norma C. Cagle.

## OPINION

FRANK W. WILSON, Chief Judge.

This case is presently before the Court for settlement upon a plan that will accomplish full and final desegregation of the Chattanooga, Tennessee public schools in accordance with recent deci-

sions of the United States Supreme Court and of the United States Court of Appeals for this Circuit. The case has a lengthy history. A recitation of that history is set forth in an opinion of this Court entered upon February 19, 1971, wherein the Court also set forth certain guidelines that were to be followed in conducting further hearings upon the présent phase of the lawsuit. Pursuant to the guidelines referred to, extensive further hearings were held regarding the effectiveness of prior desegregation plans to accomplish the establishment of a unitary school system in Chattanooga as that concept has been defined in recent appellate court decisions, including the decision of the United States Supreme Court in the case of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). At the conclusion of the evidentiary hearing on May 19, 1971, this Court entered an opinion from the bench finding that previous plans had not succeeded in accomplishing a unitary school system, basing its finding in this regard upon the undisputed evidence, and directing the defendants to submit further plans for the final accomplishment of a unitary school system in Chattanooga in accordance with the *Swann* decision and other recent appellate court decisions. Following the submission of desegregation plans both by the plaintiff and by the defendants, a further hearing was held upon July 19, 1971, at which evidence was received in support of and in opposition to the respective plans before the Court. Also at that time argument was received and a decision was reserved upon certain motions pending in the case.

## PENDING MOTIONS

Turning first to the pending motions upon which decision has been reserved, these include:

(1) A motion by four citizens and residents of Chattanooga, Tennessee, to be allowed to intervene;

(2) A motion by the defendants seeking reconsideration of the Court's find-ings and order entered May 19, 1971, wherein the Court directed the defendants to submit further desegregation plans; and

(3) A motion by the defendants to strike the plaintiffs' objections to the defendants' desegregation plan.

■ Regarding the motion to be allowed to intervene, the intervenors assert various objections to the proposed desegregation plans submitted by the present parties to this litigation. The relief sought by the intervenors is to be allowed to present their objections to the desegregation plans now before the Court, to be allowed to join the Hamilton County, Tennessee, Board of Education as a party defendant, and to establish a uniform racial ratio in the combined City of Chattanooga and Hamilton County School Systems. The defendants have raised no objection to the intervention, but the plaintiffs have objected. Having considered the briefs and arguments of counsel, the Court is of the opinion that the motion to intervene must be disallowed and this for more reasons than one.

In the first place, it does not appear that the motion has been timely filed. This lawsuit has now been in litigation for more than 11 years. Extensive hearings and extensive relief has heretofore been granted and appellate review of that relief has. been had upon three prior occasions. See Mapp v. Board of Education of City of Chattanooga, D.C., 295 F.2d 617 (1961); D.C., 203 F.Supp. 843 (1962); 6 Cir., 319 F.2d 571 (1963); 6 Cir., 373 F.2d 75 (1967); D.C., 274 F. Supp. 455 (1967). The present phase of the lawsuit has been in active litigation for more than a year. Evidentiary hearings extending over a period of ten days were completed within the past two months. Both the plaintiff and the defendants have now submitted desegregation plans. The motion to intervene came only seven days before a hearing was scheduled to commence for final approval of a desegregation plan which in part, if not in its entirety, must be im-

plemented in the six weeks that remain before the opening of school in September 1971. To allow intervention at this advanced stage of the litigation, particularly intervention which seeks to add new parties, to litigate the legality as well as the propriety of adding the new parties, and to litigate all relevant issues regarding a school system not presently before the Court, could only unduly burden and delay the present litigation. See Kozak v. Wells, 278 F.2d 104, (C.A.8, 1960); Pyle-National Co. v. Amos, 172 F.2d 425, (C.A.7, 1949), note, "The Requirements of Timeliness Under Rule 24 of the Federal Rules of Civil Procedure," 37 Va.L. Rev. 563.

Insofar as the intervenors seek the right to interpose objections to the desegregation plans now before the Court, it is believed that all matters in this regard are being vigorously and extensively contested by the present litigants. There is nothing in the record or history of this litigation to indicate any inadequate representation of any relevant viewpoint regarding any issue that has heretofore been before the Court or that is now before the Court. Rather, every issue throughout the long history of this litigation has been vigorously and resourcefully contested and has been resolved only by decision of the Court. In 11 years there has been no significant issue resolved by agreement of the parties. In this connection it may be further noted that while the intervenors are critical of the transportation provisions in the plans now before the Court, the proposed relief sought by them would require much more extensive transportation than proposed in any plan now before the Court.

Finally, insofar as the intervenors seek to join the Hamilton County Board of Education and to establish a uniform racial ratio in the combined City of Chattanooga and Hamilton County School Systems, they appear to be asserting a new lawsuit based upon new and untested legal theories. No direct authority has been cited for the consolidation of two school systems by judicial fiat. Rather,

such matters have historically been left for legislative, executive, or political resolution, all as borne out by the numerous statutory citations in the intervenors' briefs, all of which without exception contemplate resolution by such means. Although the intervenors assert that they do not seek consolidation, but only a joint unitary school plan, it does not readily appear how this would differ from consolidation when it is borne in mind that transportation and other facilities would be subject to joint use, and that staff, teachers and students would be subject to interchange between the systems. Likewise, the geographical, political, or other limitations for determining which school systems might be joined for such relief is new matter upon which no prior authority appears to exist. Additionally, the entire matter of whether the Hamilton County School Systems was or was not itself operating a unitary school system would appear to be a subject for new litigation.

For all of the foregoing reasons the Court is of the opinion that the motion to intervene must be denied.

■ ■ Taking up next the defendants' motion seeking reconsideration by the Court of its decision upon May 19, 1971, wherein the Court found that the present Chattanooga School System was not a unitary one as required by recent Supreme Court and other appellate court decisions, the motion is predicated upon the contention that the issue of whether the Chattanooga schools were unitary had been decided in the course of previous hearings and was therefore res judicata. The motion appears to be based largely upon the recent Sixth Circuit decision in the case of Goss v. Board of Education of City of Knoxville, Tennessee, (decided June 22, 1971) 444 F.2d 632. Although that case spoke of prior court findings of a unitary school system within the Knoxville schools, and suggested that upon traditional principles of res judicata such findings might constitute the law of the case, three matters must be noted in this regard. First, it must be noted that the Court went on

to conclude: "We believe, however, that Knoxville must now conform the direction of its schools to whatever new action is enjoined upon it by the relevant 1971 decisions of the United States Supreme Court." Second, it must be noted that in the face of prior findings of a unitary system, the Court of Appeals nevertheless remanded the case for re-determination by the District Court of the unitary school issue "consistent with Swann v. Bd. of Ed., 402 U.S. 1, 91 S. Ct. 1267, 28 L.Ed.2d 554, and other relevant Supreme Court opinions announced on April 20, 1971." Finally, as noted in the *Goss* decision, the law in the field of school desegregation has been in the process of development over the past 17 years, and concepts once thought adequate have been replaced by new and more definitive instructions from the Supreme Court. Findings of fact and conclusions of law based upon legal concepts now discarded form no basis for applying the principles of res judicata or determining the law of the case. The defendants' motion to reconsider will accordingly be denied.

Turning finally to the defendants' motion to strike the plaintiffs' objections to the amended plan for desegregation submitted by the defendants, it would appear that this motion might more appropriately be considered in connection with a review of the defendants' plan upon its merits, as will be hereinafter undertaken by the Court.

LEGAL GUIDELINES

At the conclusion of the hearing upon May 19, 1971, the Court in its opinion reviewed the relevant decisions of the United States Supreme Court and the Court of Appeals for this Circuit and set forth the legal guidelines that should direct the defendant School Board in preparing its plan for further and final desegregation of the Chattanooga schools. Without attempting again to repeat in full those guidelines, it does seem appropriate again to refer to certain of those guidelines.

■ In the first place, the fundamental proposition bears repeating that the legal basis for this lawsuit is that provision of the Fourteenth Amendment to the United States Constitution which requires that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This Court is charged with the responsibility of requiring nothing less of the Chattanooga schools than full compliance with the Equal Protection Clause. This Court is permitted to require nothing more of the Chattanooga schools than such full Constitutional compliance.

■ In the second place, full compliance with the Equal Protection Clause of the Constitution requires the elimination from public schools of "all vestiges of state imposed segregation" and in this connection "the burden upon school authorities will be to satisfy the Court that their racial composition (*i. e.*, the racial composition of each school) is not the result of present or past discrimination upon their part." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The responsibility of the Court is to assure that the Chattanooga schools "operate now and hereafter only unitary schools," that is, schools "in which no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

■ In the third place, while freedom of choice in matters of school attendance may have appealing features, "if it fails to undo segregation, other means must be used to achieve this end" and "freedom of choice must be held unacceptable." Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

■ Finally, it should be remembered that the initial responsibility for devising and implementing constitutionally adequate plans for the full and final desegregation of the Chattanooga schools lies with the school authorities and that

"judicial authority enters only when local authority defaults." Swann v. Charlotte-Mecklenburg Board of Education, *supra*. It should accordingly be the purpose of the Court to leave unto the School Board the maximum discretion and responsibility for all phases of the operation of the Chattanooga Public Schools, limited only by constitutional requirements. Absent a constitutional violation, the wisdom or lack of wisdom of any plan or policy established by the Board is not a proper subject for judicial intervention or direction. The Court should not substitute its judgment for that of the School Board in areas where the exercise of judgment does not violate some principle of the law. Mapp v. Board of Education of City of Chattanooga, D.C., 203 F.Supp. 843 (1962), aff. 6 Cir., 319 F.2d 571.

## PLANS FOR FINAL DESEGREGATION OF THE CHATTANOOGA SCHOOLS

Before undertaking an analysis and evaluation of the desegregation plans submitted by the respective parties, a statement of certain relevant historical matters and background data regarding the City of Chattanooga and its schools would be helpful. The City of Chattanooga, located upon the southeastern border of the State of Tennessee, was a part of the Southern Confederacy during the War Between the States. Although the City in modern times has become one of the most progressive and forward looking cities of the South, traditions of the past have their role and their influence. Memories of the past linger, with innumerable historical monuments marking the sites of some of the most significant events of the War Between the States and with the City's rich lore of history being recalled by such names and places as Missionary Ridge, Lookout Mountain, Signal Mountain, Orchard Knobb, and Chickamauga Battlefield. Among other traditions inherited from the past, the City inherited the practice of operating a dual system of schools for its black and white citizens. Pursu-

ant to the decision of the United States Supreme Court in the case of Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), this lawsuit was instituted. The purpose of this lawsuit since its filing in 1960 has been to remove that dual system of schools and replace it with a unitary system in which all vestiges of racial discrimination have been eliminated. In the intervening years very substantial progress has been made. Following appellate guidelines as they then existed, this Court believed upon each previous occasion it entered desegregation orders, first in 1962, then in 1965 and 1967, that all vestiges of the dual system of schools would be removed upon fulfilment of its orders and only a unitary system remain. Experience and appellate redefinition of the concept of a unitary school system have now mandated that further steps be taken to accomplish the full and final desegregation of the Chattanooga schools. As reflected by the undisputed evidence, a number of the Chattanooga schools remain racially identifiable.

Turning to certain relevant data, it may first be noted that the City of Chattanooga, according to the 1970 census, has a population of 118,661 persons. Of these 43,199 or 36.4% were black. These population statistics reflect that even in the face of some annexation by the City, there has been a net decline in the City's population since 1960 of 11,321 persons with all but 27 of this decline being in the white population. In the 1970–71 school year, the total school enrollment was 25,967 students. Of this total, 12,669, or 48.8% were black students and 13,298, or 51.2% were white students.

At the time of the recent evidentiary hearing upon the issue of compliance, the plaintiff submitted a plan for the desegregation of the Chattanooga schools. That plan is set forth in Exhibits 124 thru 135. In essence the plaintiff's plan calls for the establishment of a racially balanced faculty and staff in each school and the establishment of racial ratios among students in each school, with no school having less than 30% nor more

than 70% of one race. The racial balance of faculty and staff in each school is to be accomplished by administrative assignment. The racial ratios among students is to be accomplished by rezoning, pairing, grouping and clustering elementary schools, by rezoning and reordering the feeder systems into the junior high schools, and by rezoning of the high schools. Extensive transportation of students, both to contiguous and non-contiguous school zones, would be required to effectuate the plaintiff's plan.

As stated in the legal guidelines set forth above, the initial responsibility for devising and implementing constitutionally adequate plans for full and final desegregation of the Chattanooga schools lies with the school authorities. Accordingly, before giving further consideration to the plaintiff's desegregation plans, it is appropriate that the Court should first turn its attention to the defendants' plan for desegregation of the Chattanooga schools. The wisdom and appropriateness of this procedure is further enhanced in this case by the apparent good faith efforts of the Chattanooga school authorities and School Board to come forward with a plan that accords with the instructions given by the Court in its order of May 19, 1971, and with the appellate guidelines therein cited. It is also appropriate to note in this regard that both the administrative staff and the Chattanooga Board of Education are themselves fully desegregated, and this by voluntary or elective action. The Board of Education is comprised of seven members. Three of these members, including the Commissioner of Education, a duly elected official of the City of Chattanooga, are black. Four of the Board members are white. Three of the top school staff officials who testified at the hearings held recently were black, including the Assistant Superintendent of Schools and the Director of Teacher Recruitment.

Turning to the defendants' plan, a few words in regard to its organization are in order. The plan, as set forth in Exhibit 146, consists of an introduction, stating policy, Paragraphs I thru VIII, stating the plan, and Appendices A and B, setting forth the statistical justification and illustrating the plan. Illustrative school zoning maps for the elementary, junior high and high schools are shown in Exhibits 143, 144, and 145 respectively.

No criticism of the enrollment projections set forth in Paragraph I of the plan are made by the plaintiff and none are found by the Court. This portion of the plan is accordingly approved.

Paragraph II of the plan, when read in conjunction with the statistical data set forth in Appendix A and the illustrative matter set forth in the school attendance zone maps (Exhibits 143, 144 and 145) defines the new proposed student attendance zones and sets forth the methods proposed for accomplishing full and final student desegregation. The sufficiency of insufficiency of these proposals can best be determined by considering the elementary, junior high and high school plans in order.

### Elementary Schools

During the school year 1970–71, the Chattanooga School System operated 33 elementary schools. Of the ten former black elementary schools within the system, four remained all black and a total of only 30 white students attended the other six. In the 23 former white elementary schools there were 13,250 white children and 3,446 black children. Four former white elementary schools (Cedar Hill, Normal Park, Pineville, and Rivermont) remained all white. Barger had only two black students and East Lake had only three black students. Two former white elementary schools (Avondale and Glenwood) had changed to all black schools, having only three white students between them. The remainder of the former white elementary schools had ratios of black students varying from a low of 4% to a high of 64%.

The School Board proposes the accomplishment of a unitary system within the elementary schools by the closing of five

elementary schools, by the pairing of 16 elementary schools, by the clustering of six elementary schools, by the rezoning of three elementary schools, leaving the attendance zones of only three elementary schools unchanged. The overall result of the defendants' plan is to achieve a racial ratio of not less than 30% nor more than 70% of any race in each elementary school within the system with but five exceptions (Barger—20% black and 80% white; Carpenter—86% black and 14% white; Long—16% black and 84% white; Rivermont—12% black and 88% white; and Sunnyside—15% black and 85% white). These five schools will be discussed further shortly.

Turning first to the five elementary schools that are proposed for closing, three were substantially all black last year (Davenport, Glenwood, and Trotter), one was substantially all white last year (Cedar Hill), and the fifth (Amnicola) had a majority of black students but was quite small. No meritorious objections are believed to have been raised by the plaintiffs to the selection of schools for closing. Furthermore, their closing contributes to the overall plan for desegregation and sound fiscal, safety, and administrative reasons were given by school authorities for each school so selected for closing.

With regard to the five elementary schools that will retain racial ratios of less than 30% or more than 70% of one race, the Court is of the opinion that the Board has carried the burden of establishing that their racial composition is not the result of any present or past discrimination upon the part of the Board or other state agency. Rather, such result is the consequence of demographic and other factors not within any reasonable responsibility of the Board.

Barger, having a proposed racial ratio of 20% black and 80% white, is paired with Sunnyside with the effect of giving that school a racial ratio of 15% black and 85% white. These schools, particularly Sunnyside, are located in an area of the City where the residential patterns are rather rapidly becoming more black. The completion of housing projects now in progress in the area will speed up this trend. No purpose of discrimination appears with regard to pairing of these two schools. Rather, sound planning for the elimination of racial discrimination supports the plan of the Board in this regard.

Carpenter, having a proposed racial composition of 86% black and 14% white, is located within a sizeable area of the City that has a heavily black private residential pattern. Further, due to commercial expansion and expansion of the University of Tennessee within this area, and the consequent decline of elementary students, Carpenter is scheduled for closing within one or two years. Not only will time shortly remove any problem at Carpenter, but the inclusion of the school in some pair or cluster at this time would only serve to shortly impair the overall plan.

Elbert Long, having a proposed racial ratio of 16% black and 84% white, is located on the eastern extremity of the City. It is located within a sizeable area of the City having a private residential pattern that is substantially white. There are no contiguous areas having a significant number of blacks, other than possibly areas outside the present municipal limits. Any significant annexation that may occur is likely to occur within this area and will include additional blacks. No purpose of discrimination appears regarding the zoning of this school.

Much that has been said regarding the Elbert Long School is also true of the Rivermont School, which under the defendants' plan will have a racial ratio of 12% black and 88% white. This school is located in the northern extremity of the City, and was recently acquired from the County by annexation. At the time it was acquired, it was all white and remained all white during the past school year. To accomplish desegregation the defendants propose to close Amnicola School, which is located across the Ten-

nessee River, and place those students in Rivermont. This involves transportation of students for a substantial distance, but is nevertheless the nearest area having any significant black residential population. No purpose of discrimination appears regarding the consolidation and rezoning of these schools.

 All 27 of the remaining elementary schools not heretofore discussed will have racial ratios of not less than 30% nor more than 70% of any race in each school. The Court has carefully reviewed the treatment proposed for each school, together with all statistical demographical and other data available in the record. To the extent that any student racial imbalance exists in any of the elementary schools, the Court is of the opinion that the Board has carried the burden of establishing that such racial imbalance as may remain is not the result of any present or past discrimination upon the part of the Board or other state agency. Rather, such limited racial imbalance as may remain is the consequence of demographical, residential, or other factors which in no reasonable sense could be attributed to School Board action or inaction, past or present, nor to that of any other state agency.

 The Court is accordingly of the opinion that the defendants' plan for desegregation of the Chattanooga elementary schools will eliminate "all vestiges of state imposed segregation" as required by Swann v. Charlotte-Mecklenburg Board of Education, *supra*. Under these circumstances, it is accordingly not necessary for the Court to consider other or alternate plans. Likewise it would not be proper for the Court to pass judgment upon whether another plan would accomplish a "better" result from the viewpoint of educational policy and apart from any issue of legality.

### Junior High Schools

During the school year 1970–71, the Chattanooga School System operated 12 junior high schools. Of the four formerly black junior high schools within the system, two remained all black and a total of only 9 white students attended the other two. In the eight formerly white junior high schools, there were 3,341 white students and 908 black students. One formerly white junior high school (East Lake) had only one black student. The remainder of the formerly white junior high schools had ratios of black students varying from a low of 8% to a high of 70%.

The School Board proposes the accomplishment of a unitary system within the junior high schools by closing two junior high schools and by rezoning the remaining ten junior high schools, tying them into the restructured elementary school system. The overall result of the defendants' plan is to achieve a racial ratio of not less than 30% nor more than 70% of any race in all but three junior high schools. Those three schools are Hardy, with 73% black and 27% white, Dalewood, with 29% black and 71% white, and Long, with 15% black and 85% white. Further discussion will be given to these three schools.

Turning first, however, to the two junior high schools that are proposed for closing, one is a former black school and the other is a former white school. The former black school, Howard Junior High School, was all black last year. The former white school, Lookout Junior High School, was 37% black and 63% white last year. No objections were raised by the plaintiffs to the selection of schools for closing. The Board represents that the closing of Howard Junior High School was necessary to the effectiveness of their overall plan. They represented that the closing of Lookout Junior High School was necessary in order to obtain desegregation of Alton Park Junior High School, one of the former all black junior high schools. Alton Park is stated to be a new school with greater capacity, whereas Lookout is one of the older and smaller junior high schools. Furthermore, financial economies, along with optimum development of quality instruction programs, were given as addi-

tional reasons for the selection of the junior high schools to be closed.

Turning to the three junior high schools that will retain a racial ratio of less than 30% or more than 70% of one race, Hardy Junior High School is expected to have a ratio of 73% black and 27% white. Until 1965 Hardy was an all white school. Changing residential patterns have gradually changed the racial composition of the school to its present pattern. The proposed zone for Hardy is bounded by obstacles to its enlargement, including Missionary Ridge on the east, the Tennessee River on the west, the city limits on the north, and predominantly black residential areas on the south. Under all of these circumstances, the Court is of the opinion that the Board of Education has carried the burden of establishing that such racial imbalance as remains at Hardy Junior High School arises from conditions beyond the responsibility of the Board and is not the result of any present or past discrimination on the part of the Board or of any state agency.

Dalewood Junior High School, a former white school, is expected to have a ratio of 29% black and 71% white under the present plan. However, the trend in residential patterns in the zone is toward increasing the black population. Apartments now under construction will shortly increase the ratio of black students to a point in excess of 30%. No purpose of discrimination appears in the zoning of the Dalewood Junior High School.

The final junior high school having a ratio in excess of 70% is the Elbert Long Junior High School. Under the defendants' plan this school will have a racial composition of 15% black and 85% white. Everything that the Court has heretofore said in regard to the Elbert Long Elementary School is applicable to the junior high school. Additionally, the Elbert Long Junior High School is the smallest junior high school in the system, having an enrollment of only 166 students.

All of the remaining junior high schools not heretofore discussed will have ratios of not less than 30% nor more than 70% of any race in each school. The Court has carefully reviewed the proposed racial composition of each school and all of the relevant statistical, residential, demographical, and other data available in the record. The Court has also considered the manner in which the junior high schools are tied into the elementary school plan which the Court has hereinabove approved. In this connection the Court cannot overlook the fact that it is a matter of great importance to proper school administration that school authorities be able to make reasonably reliable forecasts of school enrollments. To do this there needs to be a carefully devised system of feeder schools. In the light of all the record, the Court is of the opinion that the junior high school plan as submitted by the defendants removes all state created or state imposed segregation. To the extent that any student racial imbalance exists in any of the junior high schools, the Board has carried the burden of establishing that such racial imbalance as remains is not the result of any present or past discrimination upon the part of the Board or upon the part of other state agencies. Rather, such limited racial imbalance as may remain is the consequence of demographical, residential, or other factors which in no reasonable sense could be attributed to School Board action or inaction, past or present, nor to that of any other state agency. The Court is accordingly of the opinion that the defendants' plan for desegregation of the Chattanooga junior high schools will eliminate "all vestiges, of state imposed segregation" as required by the *Swann* decision. It is accordingly unnecessary to consider other or alternate plans.

### *High Schools*

During the school year 1970–71, the Chattanooga School System operated five high schools. These included four general curricula high schools and one

technical high school. Kirkman Technical High School offers a specialized curricula in the technical and vocational field and is the only school of its kind in the system. It draws its students from all areas of the City and is open to all students in the City on a wholly non-discriminatory basis pursuant to prior orders of this Court. Last year Kirkman Technical High School had an enrollment of 1218 students, of which 129 were black and 1089 were white. The relatively low enrollment of black students was due in part to the fact that Howard High School and Riverside High School, both of which were all black high schools last year, offered many of the same technical and vocational courses as were offered at Kirkman. Under the defendants' plan these programs will be concentrated at Kirkman with the result that the enrollment at Kirkman is expected to rise to 1646 students, with a racial composition of 45% black students and 55% white students. No issue exists in the case but that Kirkman Technical High School is a specialized school, that it is fully desegregated, and that it is a unitary school.

While some variation in the curricula exists, the remaining four high schools, City High School, Brainerd High School, Howard High School, and Riverside High School, each offer a similar general high school curriculum. At the time when a dual school system was operated by the School Board, City High School and Brainerd High School were operated as white schools and Howard High School and Riverside High School were operated as black schools. At that time the black high schools were zoned, but the white high schools were not. When the dual school system was abolished by order of the Court in 1962, the defendants proposed and the Court approved a freedom of choice plan with regard to the high schools. The plan accomplished some desegregation of the former white high schools, with City having 141 black students out of an enrollment of 1435 and Brainerd having 184 black students out of an enrollment of 1344 during the 1970–

71 school year. However, both Howard, with an enrollment of 1313, and Riverside, with an enrollment of 1057, remained all black. The freedom of choice plan "having failed to undo segregation * * * freedom of choice must be held unacceptable." Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

The School Board proposes to accomplish a unitary school system within the high schools by zoning the four general curricula high schools with the following results in terms of student ratios:

| | Black Students | White Students |
|---|---|---|
| Brainerd High School | 32% | 68% |
| Chattanooga High School | 44% | 56% |
| Howard High School | 75% | 25% |
| Riverside High School | 75% | 25% |

The plaintiffs have interposed objections to the defendants' high school plan upon the ground that it does not achieve a racial balance in each school. To some extent these objections are based upon matters of educational policy rather than legal requirements. It is of course apparent that the former white high schools, particularly Brainerd High School, remain predominantly white and that the former black high schools remain predominantly black. However, the defendants offer some evidence in support of the burden cast upon them to justify the remaining imbalance. The need for tying the high school zones to feeder junior high schools is part of the defendants' explanation. Residential patterns, natural geographical features, arterial highways, and other factors are also part of the defendants' explanation.

A matter that has given concern to the Court, however, and which the Court feels is not adequately covered in the present record, is the extent to which the statistical data upon which the defendants' plan is based will correspond with actual experience. Among other matters there appears to be substantial unused capacity in one or more of the city high schools. Before the Court can properly evaluate the reliability of the

statistical data regarding the high schools, the Court needs to know whether the unused capacity does in fact exist and, if so, where it exists, whether it will be used and, if so, how it will be used. It would be unfortunate indeed if experience shortly proved the statistical data inadequate and inaccurate and this Court was deprived of the opportunity of considering those matters until on some appellate remand, as occurred in the recent case of Davis v. Board of School Commissioners of Mobile, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577.

The plaintiff has submitted a high school plan with high school zones which the plaintiff's witness has testified will achieve a racial balance in each high school. However, this plan is not tied into the junior high school plan hereinabove approved and the Court is unable to say whether it could be so tied in. Furthermore, the same statistical problem discussed above would appear to exist with regard to the plaintiff's plan.

The Court accordingly is unable to give final approval to a high school desegregation plan at this time. Time, however, is a pressing factor. Pre-school activities will commence at each high school within less than a week, if in fact they have not already commenced. Full commencement of the fall term is only one month away. It is clear that the high schools must move at least as far as is proposed in the defendants' high school plan. Accordingly, the Court will give tentative approval only at this time to the defendants' high school plan in order that at least as much as is therein proposed may be placed into operation at the commencement of the September 1971 term of school. Further prompt but orderly judicial proceedings must ensue before the Court can decide upon a final plan for desegregation of the high schools.

 In the meanwhile, the defendants will be required to promptly provide the Court with information upon the student capacity of each of the four high schools under discussion, upon the amount of unused space in each of the four high schools, the suitability of such space for use in high school programs, and the proposed use to be made of such space, if any. In this connection the defendants should likewise advise the Court regarding its plan as to tuition students. Last year almost one-third of the total student body at City High School were non-resident tuition paying students. There is no information in the present record as to the extent the Board proposes to admit tuition students nor the effect this might have on the racial composition of the student body. The Court has no disapproval of the admission of tuition students nor to the giving of preference to senior students in this regard, provided that the same does not materially and unfavorably distort the student racial ratios in the respective schools. Otherwise, the matter of admitting tuition students addresses itself solely to the discretion of the Board. No later than the 10th day of enrollment the defendants will provide the Court with actual enrollment data upon each of the four high schools here under discussion.

## TRANSPORTATION

The defendants propose to make available limited transportation for some elementary and junior high school students. Under the defendants' plan elementary school students will continue to report in the morning and depart in the evening from their nearest elementary school. School sponsored transportation will be provided to and from the paired and clustered schools and to those students living more than one and one-half miles from their nearest school. On the junior high level transportation will be provided only to students living more than one and one-half miles from the school to which they are assigned. No school sponsored transportation is proposed for high school students.

The estimate of total capital outlay and operating expenses for the transportation proposed is $468,126.00. While this is a burden for a city, which, like all cities,

is faced with revenue shortages, a substantial portion of the transportation expense is borne by the State. No estimate was placed in the record of the economies to be effected or the savings to be made by the consolidation of schools and the closing of five elementary schools and two junior high schools, but these savings will doubtless be substantial.

■ The defendants' transportation proposals are substantially less than those proposed by the plaintiffs. No cross-town busing is proposed by the defendants. The Court, however, believes that the defendants' transportation proposals are adequate to assure fulfilment of all student desegregation plans heretofore approved. Accordingly, the defendants' proposals in this regard are approved.

## REMAINING PROVISIONS OF THE DESEGREGATION PLAN

There remain to consider those portions of the defendants' plan as set forth in Paragraph III thru VIII of the plan. Paragraph III of the plan provides for non-discriminatory practices in educational programs and in extracurricular activities. No objection was raised to this portion of the plan and the Court is of the opinion that it is adequate to avoid any discrimination in these areas. Moreover, the evidence does not indicate that any such discrimination is now being practiced within the Chattanooga School System, but rather bears out the testimony of the defendants' witnesses that all such practices have heretofore been eliminated.

Regarding student transfers, the defendants propose in Paragraph IV of their plan to greatly simplify their previously complex student transfer plan and provide for transfers only in the following situations: (a) the majority to minority transfers, as required by the *Swann* decision, (b) the non-discriminatory transfer of orthopedically handicapped children, (c) the non-discriminatory transfer of students eligible for special education programs, and (d) permission

for students, upon moving their residence to another zone within the school year, to elect to complete a school year in the school of their initial assignment. The transfer provisions appear to be wholly free of any potential for discrimination. Moreover, the evidence is undisputed that the defendants have heretofore administered their previous transfer plan in a manner that was wholly free from racial or other discrimination. Nor was it in any manner used to avoid desegregation, although the potential for such use may have existed to an extent beyond that possible under the proposed transfer plan. Paragraph IV of the defendants' plan will be approved.

■ The defendants' plan for desegregation of faculty and other staff as contained in Paragraph V provides for the assignment of teachers and staff to each school in ratio to their existence within the system and in a manner so as to avoid any racial identification of one school from another. Other provisions to avoid racial discrimination in the recruitment, assignment, reassignment, promotion, and demotion of teachers and staff are made. The provisions of the defendants' plan in this regard appear to provide for removal of all vestiges of racial segregation in matters of staff and faculty. The plaintiff proposes that a number of additional provisions be added that are intended to regulate potential discriminatory practices which the record shows clearly are not and have not been practiced within the Chattanooga School System since its desegregation under prior orders of the Court. There appears to be no purpose in multiplying restrictions for which no need or justification in fact exists. A school system that has voluntarily placed a black staff member in charge of teacher recruitment and assignment needs no Court-imposed restrictions on potential forms of faculty discrimination which the record clearly and affirmatively shows it does not practice.

■ Paragraph VI of the defendants' plan, relating to school construc-

tion and site selection, provides that such activities shall be conducted in a manner to avoid a reoccurrence of a dual school system and that any proposal in this regard shall be subject to judicial review regarding its legality before it shall be implemented. The evidence reflects that no site selection, construction, or proposed construction is presently pending or in the offing. While somewhat different wording of the defendants' plan in this regard is urged by the plaintiff, the Court is of the opinion that the defendants' proposal adequately fulfils the requirements of the law in regard to school construction and site selection. This provision of the plan will accordingly be approved.

Finally, Paragraph VII of the defendants' plan proposes a continuation of the practice of annual reporting of desegregation statistics. The defendants' plan, however, is limited to an additional report in October of 1971. It is believed that the plan must be amended to provide for the continuation of such annual reports until a final order of compliance may be entered.

## IMPLEMENTATION OF PLAN

■■■ There remains to consider the matter of implementation of the various provisions of the plan for desegregation hereinabove approved by the Court. No lawful or judicially acceptable reason appears why the provisions of the plan hereinabove approved should not be implemented in time for the commencement of the 1971–72 school term; provided, however, that in implementing any portion of the plan regarding student assignments in the elementary and junior high schools as is dependent upon acquiring, staffing, and scheduling transportation facilities not now available to the schools, may be delayed until such facilities can be made available in the prompt, orderly, and necessary course of school and governmental affairs and can be placed in use with a minimum of disruption to the educational program. It appears undisputed in the record that the defendant does not now have availa-

ble the facilities for accomplishing the transportation requirements of its plan. It is likewise established in the record that such facilities cannot be financed, acquired, staffed, and routed within the short time that remains before the commencement of school in September 1971, without total disregard for all orderly processes of government. The defendants will accordingly be permitted to implement such portions of its elementary and junior high school plans as may be feasible with the transportation facilities reasonably available to it at the commencement of the September term of school, and will be permitted to delay the implementation of any remaining portions of the said student assignment plans in the elementary and/or junior high schools until the transportation facilities necessary therefor can be acquired in the prompt but orderly process of school administration and of local governmental affairs, and until such facilities can be placed in use with safety and with a minimum interruption to the educational program. As soon as the defendants can formalize their plans in this regard, and in no event later than within 30 days, the defendants will advise the Court of their proposed implementation schedule in accordance with the foregoing.

Having considered and decided all issues appropriate for decision at this time, the defendants will prepare and submit an order in accordance with this opinion.

## ADDENDUM

The legal decisions in this case are for the present completed. A few further words, however, seem in order. This Court would hope that its opinion might be read with an effort at understanding by those who have an interest in the problems here discussed. Although the Court has tried earnestly to weigh the evidence and to follow the law, if errors have been made by the Court in what has been here decided, judicial processes are available to correct those errors.

If understanding of the legal basis for the decisions heretofore made cannot be given, then the Court can only appeal to the conscience of the community for that understanding.

As anyone who has kept up with public affairs in recent times must know, Chattanooga is not being singled out for special judicial treatment. One has but to read to know that most of the major cities of this Nation are contending with the problems here being judicially dealt with. The City of Chattanooga can never expect to remain an island within the Nation living in the pre-Brown v. Board of Education era, when the rest of the Nation is moving into the post-Brown v. Board of Education era. This City has made great progress in racial affairs in recent years. Though some were opposed at the time to that progress, few would now publicly propose that the racial clock be run back in Chattanooga to where it stood in 1960, and none would suggest that it be run back to where it existed a century ago.

This Court is not insensitive to the fears and anguish expressed by some within the City in recent days, nor does it relish the abuse and worse that has been so abundantly shared by word and letter, but this Court would be unworthy of trust in the least of its functions if it were to allow these things to cause it to deviate in the least from its sworn duty to uphold the Constitution and the laws as that Constitution and as those laws have been duly established and interpreted by the properly constituted authorities, including the United States Supreme Court and the Appellate Court under which this Court functions. How could anyone expect this Court to uphold a law of Congress regarding robbery of a bank, but in the face of public misunderstanding and criticism, turn its back upon the Constitutional requirement that all citizens be treated equally before the law?

There may well exist basis for criticism of the interpretation placed upon the Equal Protection Clause by the United States Supreme Court as it applies to public schools. But there can be not the least doubt that this Court, as well as every Court in the Nation, is bound by that interpretation. Furthermore, who is so certain of the correctness of his own views of the Equal Protection Clause that he would be willing to swap places in the social and racial scheme of affairs in our society? How many are so convinced of the correctness of their own interpretation of that clause that they would be willing to live in a society in which each man is free to make his own interpretations of all laws? Surely thoughtful men must agree that the rule of the law is the single greatest achievement of the centuries' long struggle for freedom.

This City can continue upon the path of orderly progress and racial harmony in all of its affairs, including the operation of its schools. This City can live within the law. This City can maintain and improve its program of quality education for all children within its schools. This City can have one of the finest school systems within the State or within the Nation, but it first must believe that it can. It first must want the finest schools for its children. Medieval Florence, a miserable hovel of a City compared with modern Chattanooga, gave America its name and the world the Renaissance. But it did it only because its leaders and its people believed that it could be done and willed that it should be done.

Equal protection of the law might not seem so heavy a burden for anyone to carry if he felt that it were truly his brother's child who was asking for it. Quality education might not seem so difficult for anyone to maintain if it were truly his brother's child that was being deprived or handicapped by its denial.

This City has seen its share of law violators, racial disharmony, fear, and distress in recent weeks and months. For those who believe that defiance of the law can be replaced with willing obedience, for those who believe that

racial strife can be replaced with racial harmony, for those who believe that fear can be replaced with trust, for those who believe that quality education can be maintained and enlarged within the Chattanooga Public Schools, for those who believe that mankind can live in peace and harmony with his fellowman, for those who believe in the essential brotherhood of man, the bell tolls now.