373 F.2d 75
 James Jonathan MAPP and Deborah L'Tanya Mapp, Minors, By
James R. Mapp, their Father and next friend et
al., Plaintiffs-Appellants,
v.
The BOARD OF EDUCATION OF the CITY OF CHATTANOOGA, HAMILTON
COUNTY, TENNESSEE et al., Defendants-Appellees.
 No. 16877.
 United States Court of Appeals Sixth Circuit.
 Feb. 27, 1967.
 
 Avon N. Williams, Jr., Nashville, Tenn., for appellants, Jack Greenberg, Derrick A. Bell, Jr., New York City, Z. Alexander Looby, Nashville, Tenn., on the brief.
 Raymond B. Witt, Jr., Chattanooga, Tenn., for appellees, Witt, Gaither, Abernathy & Wilson, Chattanooga, Tenn., on the brief, Eugene N. Collins, Chattanooga, Tenn., of counsel.
 Before WEICK, Chief Judge, and O'SULLIVAN and EDWARDS, Circuit Judges.
 WEICK, Chief Judge.
 
 
 1
 The history of these proceedings dates back more than six years to the time when plaintiffs-appellants filed their original action in the District Court to compel the desegregation of the Chattanooga Public School System. Since the original (1961) and 319 F.2d 571 (1963). of a plan of desegregation, both parties have prosecuted appeals to this Court involving various features of the plan and its administration. See 295 F.2d 617 (1951) and 319 F.2d 571 (1963).
 
 
 2
 The present appeal stems from plaintiffs' motion for further relief, filed March 29, 1965. At that time the School System was operating under a plan which provided for gradual integration, beginning with grades 1 through 3, in September, 1962, and culminating in complete dissolution of the preexisting dual system in September, 1968, when all grades in the high school would be integrated. Plaintiffs asked that this plan be accelerated to achieve full integration by September, 1965; that faculty and other professional personnel be assigned to schools without regard to race; and that all other practices which they deemed racially discriminatory be eliminated immediately.
 
 
 3
 After hearing the evidence, the District Judge ruled that the plan should be accelerated to provide for full integration of all grades in September, 1966. He further held that plaintiffs' evidence was not sufficient to support their claim that the School Board had administered its transfer regulations to defeat desegregation, and that the time was not ripe to enter any judgment on the sufficiency of the Board's efforts to desegregate its teacher assignments. It is from this order that plaintiffs appeal.
 
 
 4
 Both parties agree that the issue of faculty assignments is governed by Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), which was decided after the District Court's order. In that case the Supreme Court held that a full evidentiary hearing on the issue of faculty allocation on a racial basis is a necessary part of any decision on the adequacy of a plan of desegregation. While some evidence on this issue was offered at the last hearing in this case, the District Court declined to rule on it, preferring to allow the Board more time to cope with it. However, Bradley clearly indicates that this issue must be decided at the same time that the rest of the desegregation plan is formulated.
 
 
 5
 Therefore, we remand the case to the District Court for consideration of the issue in the light of Bradley.
 
 
 6
 The plaintiffs' attack on the Board's use of transfer regulations centers on provision 2(i), and particularly subsection 2 of that section. Actually 2(i)-2 is less a transfer rule than a policy of repose. It provides in substance that if a student has started classes in one school and is subsequently rezoned to another school, he may choose to remain at his original school, building capacity permitting. This has been a long standing school policy, its aim being to prevent undue disruption in a child's social and educational adjustment.
 
 
 7
 In this case, the appellants attack the administration of section 2(i)-2, not its validity per se. While in one instance in the past, the change of the Clara Carpenter School from white to Negro before the desegregation case was filed, the good faith of the Board might be suspect, for the future this issue appears almost moot.
 
 
 8
 It is obvious that to be eligible for a 2(i)-2 transfer (or, more appropriately a freeze) a child must have enrolled in a school out of his present zone. In previous years up to 1966, such enrollment was possible because of the dual school zones prevailing in the undesegregated grades of the School System. However, under the accelerated plan put into effect in September, 1966, no child may enroll in a school out of his desegregated zone, no matter at what level he enters the school. Thus, within the next two years all transfers under 2(i)-2 granted with reference to the earlier segregated zones, will be phased out of the system.
 
 
 9
 The extreme example is a child who entered the second grade in September, 1963. Under 2(i)-2 that child could remain in his original school only until September, 1967, when he would start the last year of elementary school. In September, 1968, he would start at a new school, the Junior High School in his desegregated zone, and would no longer be eligible under 2(i)-2 since he had not started Junior High School in a zone other than that one in which he now lives.[1]
 
 
 10
 There was no evidence that Negro children had been discriminated against in the denial of any of their applications for transfer under the plan. This situation was illustrated by the uncontradicted testimony of the Superintendent of Schools regarding the lack of new transfers under 2(i)-2 from the East Fifth Street School after 1962-63.
 
 
 11
 In the absence of any evidence tending to show that the objective standard of 2(i)-2, original enrollment out of present school zone, was not adhered to in any case, we cannot say that the District Court's finding was clearly erroneous.
 
 
 12
 Plaintiffs' allegations in regard to subjective standards were not aimed at 2(i)-2, but rather to 2(i)-1 under which few transfers are authorized each year. Should plaintiffs in the future obtain evidence that transfers are being granted under 2(i)-2 without regard to the original legitimate placement of students, they may, of course, apply to the District Court for relief.
 
 
 13
 Plaintiffs' final contention on appeal is that the plan, as accelerated by the District Court's order below, is 'a totally ineffective vehicle for the prompt elimination of the segregated school system.' Such a broad-gauge attack was not developed in the evidence presented to the District Court. The Superintendent of Schools testified that school zone lines were drawn 'as closely as we could * * * to include enough children to fill the school, and to make it as convenient as possible for children to attend the school. * * *'
 
 
 14
 If this policy has resulted in a larger attendance of white or Negro children in any particular school it is because of their residences, a factor which the Board of Education cannot control. No child, Negro or white, has been denied the right to attend school in the zone of his residence. (High Schools in the system are not zoned.)
 
 
 15
 To the extent that plaintiffs' contention is based on the assumption that the School Board is under a constitutional duty to balance the races in the school system in conformity with some mathematical formula, it is in conflict with our recent decision in Deal v. Cincinnati Board of Education,369 F.2d 55 (6th Cir. 1966). There was no evidence of gerrymandering in the drawing of new school zone lines or other discriminatory practices in the administration of the plan. If plaintiffs have such evidence they should present it to the District Court, who will hear it and adopt findings of fact and conclusions of law. We cannot consider this issue for the first time on appeal.
 
 
 16
 The judgment of the District Court is affirmed except as to the issue of faculty assignments, and the cause is remanded for further proceedings in accordance with this opinion.
 
 
 
 [1]
 This transfer policy is clearly distinguishable from the racial minority policy condemned by the Supreme Court in Goss v. Board of Education of City of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), where the movement of pupils could take place on a racial basis at any time in the future when they so desired. Here the transfer provisions might have a racial basis, but only during a short transition period, consistent with the Board's judgment on student welfare and the Supreme Court's mandate in Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)
 It should be noted that of nearly 28,000 pupils in the Chattanooga Schools, less than 1/2% were transferred under both subsections of provision 2(i) in 1964-65, when all of the elementary schools had been desgregated. This is hardly evidence of a massive scheme of avoiding desegregation. Further, a transfer based on attendance at a previously segregated school out of his new desegregated zone, would not necessarily mean that a child could avoid the desegregation order altogether, since the school which he attended would itself be open to students of both races residing within its zone.