James Jonathan **MAPP** et al., Plaintiffs-Appellants and Cross-Appellees,

v.

The **BOARD OF EDUCATION OF** the **CITY OF CHATTANOOGA**, etc., et al., Defendant-Appellee and Cross-Appellant.

Nos. 71-2006, 71-2007, 72-1443 and 72-1444.

United States Court of Appeals, Sixth Circuit.

April 30, 1973.

William E. Miller, Circuit Judge, filed opinion concurring in result.

Weick, Circuit Judge, and O'Sullivan, Senior Circuit Judge, filed dissenting opinion.

Avon N. Williams, Jr., Nashville, Tenn., for appellant Mapp in No. 71-2006; Raymond B. Witt, Jr., Chattanooga, Tenn., for appellant Bd. of Ed. in Nos. 71-2007 and 72-1444; Eugene Collins, Chattanooga, Tenn., for appellant City of Chattanooga in No. 72-1443 (Jack Greenberg, James M. Nabrit III, Norman J. Chachkin, Sylvia Drew, New York City, W. Frank Brown, III, Witt, Gaither, Abernathy & Wilson, Chattanooga, Tenn., on briefs).

Avon N. Williams, Jr., Nashville, Tenn., for appellee Mapp in Nos. 71-2007, 72-1443 and 72-1444; Raymond B. Witt, Jr., Chattanooga, Tenn., for appellee Bd. of Ed. in No. 71-2006; Eugene Collins, Chattanooga, Tenn., for appellee City of Chattanooga in No. 71-2006 (John Henniss, W. Frank Brown, III, Ellis K. Meacham, Chattanooga, Tenn., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, Sylvia Drew, New York City, on briefs).

Before PHILLIPS, Chief Judge, WEICK, EDWARDS, CELEBREZZE, PECK, McCREE, MILLER, KENT and LIVELY, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge, in banc.

PER CURIAM.

This is a school desegregation case involving the school system of Chattanooga, Tennessee.

The present appeals are from the decisions of District Judge Frank W. Wilson reported in 329 F.Supp. 1374 (E.D.

Tenn.1971) and 341 F.Supp. 193 (E.D. Tenn.1972). Appeals have been perfected by the City Board of Education and by the City of Chattanooga and its Mayor. An appeal also has been perfected by the plaintiffs from the decision reported at 329 F.Supp. 1374 (E.D.Tenn. 1971).

The appeals originally were heard by a panel of three judges of this court, whose decision was announced on October 11, 1972. The majority opinion of the panel remanded the case to the District Court for further consideration. The dissenting opinion favored affirmance of the judgments of the District Court. Thereafter, a majority of the judges of this court who are in regular active service ordered that the appeals be reheard by the court in banc. Fed.R. App.P. 35, Local Rule 3(b) of this court provides that: "The effect of the granting of a rehearing in banc shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket as a pending appeal."

The comprehensive reported opinions of District Judge Wilson contained a full statement of the issues and pertinent facts, and repetition in this opinion is not required.

■ Upon consideration of the briefs of the parties, the oral arguments before the court sitting in banc, and the entire record, we affirm the judgments of the District Court for the reasons stated in the opinions of Judge Wilson. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554 (1971); Davis v. Board of Commissioners, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); Brown v. Board of Education [II], 349 U.S. 294, 75 S.Ct. 753, 99 L. Ed. 1083 (1955), Brown v. Board of Education [I], 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Northcross v. Board of Education of Memphis City Schools, 466 F.2d 890 (6th Cir. 1972);

Kelley v. Metropolitan Board of Education of Nashville & Davidson County, Tennessee, 463 F.2d 732 (6th Cir.), cert. denied 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972); Davis v. School District of City of Pontiac, 443 F.2d 573 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

■ The Board of Education has filed a supplemental record in this court containing statistics said to reflect changes which have occurred after the decisions of the District Court. We decline to consider these statistics in the present appeal. Appropriate relief required by changed conditions is a matter for presentation to and consideration by the District Court. We reemphasize the holding of this court in Kelley v. Metropolitan Board of Education of Nashville and Davidson County, *supra*: "Like most decrees in equity, an injunctive decree in a school desegregation case is always subject to modification on the basis of changed circumstances." 463 F.2d at 745–746.

Affirmed. Since both parties appealed, no costs are taxed.

WILLIAM E. MILLER, Circuit Judge (concurring in the result).

I concur in the result reached by the Court in these appeals.

As I read the opinion of the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), where vestiges of state-imposed segregation still exist, the district courts have broad powers to fashion remedies that will assure a unitary school system.

A careful review of the record in this case indicates to me that the district judge was not only clearly justified in holding that vestiges of state-imposed segregation still existed in the Chattanooga system, but that he did not abuse his discretion in fashioning remedies within the precepts of the Swann decision. Since for these reasons I concur in the result, I do not feel committed to all of the language, reasons and conclu-

sions set forth in the per curiam opinion of this Court or in the two opinions of Judge Wilson under review reported at 329 F.Supp. 1374 (E.D.Tenn., 1971) and 341 F.Supp. 193 (E.D.Tenn., 1972).

WEICK, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge (dissenting).

As members of the original panel who wrote the majority opinion from which the en banc hearing was ordered, we respectfully dissent.

Following the en banc hearing, the District Court's opinion was affirmed, per curiam, without, in our opinion, adequate discussion of the assignment of errors or the merits of substantial and important issues raised on appeal by the School Board and the Board of Commissioners of the City of Chattanooga. The Commissioners were the taxing authority; however, the Board of Commissioners was not made a party initially, but has since been made a party to the judgment without affording it an opportunity to question the merits of the case.

No consideration was given to the supplemental record certified to this Court by the District Court indicating substantial changes in conditions affecting the school system, brought about by mobility of both white and black families, which changes in our judgment impel a remand for consideration before we place our stamp of approval on the District Court's opinions.

We consider it right to say preliminarily that in our view no decision of the United States Supreme Court has held that in all events *and without reference to the good faith and good conduct of the involved school or other state or municipal authorities,* there must always be bussing to bring about a mix of the races. Goss v. The Bd. of Educ. of the City of Knoxville, Tenn. (6th Cir., No. 72–1766–1767, decided Mar. 29, 1973).

In the case before us, the District Judge found that the Chattanooga School Board was guilty of no bad faith and that up to February 4, 1972, the Board had, in fact, established a unitary school system "within which no person is to be effectively excluded from any school *because of race or color."* This was the command of Alexander v. Holmes County Board of Educ., 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

The District Judge's opinion dealing with the Chattanooga Board's good faith (not reported) had this to say:

"This lawsuit has been in an area *where the law has been evolving,* and the Court cannot say that the defendants have acted in bad faith in failing always to *perceive* or *anticipate* that *development* of the law. For example, in all of its orders entered prior to the decision of the United States Supreme Court in the case of Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), this Court was itself of the opinion that genuine freedom of choice on the part of students in school attendance was compliance with the Equal Protection Clause of the Constitution. While the Board has vigorously contested the plaintiff's contentions at every stage of this lawsuit, it further appears to the Court that when factual and legal issues have been resolved, the Board has at all times complied or attempted to comply in good faith with the orders and directions of the Court." (Emphasis added).

There seems now to have developed a view that since Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), nothing other than bussing will satisfy the original command of *Brown I* and *Brown II.* This is not so. In the *Swann* decision the District Court found that the school authorities there involved had flouted the *Brown* commands. His opinion cannot be read as other than a finding that the school authorities were deliberately maintaining *de jure* segregation. The opposite is true in Chattanooga. *Swann* did no more than affirm the District Judge's finding of deliberate

creation or perpetuation of *de jure* segregation.

We do not read *Swann* as holding that the Constitution requires that, black or white, a school child must now be denied the right to attend the school of his choice—desirable because of its nearness to his place of residence, or for any other circumstance prompting such choice —*solely because of the color of his skin.* In our view such a holding would collide with the commands of *Brown I* and *Brown II,* 347 U.S. 483, 74 S.Ct. 686 (1954) and 349 U.S. 294, 75 S.Ct. 753 (1955).

Can obedience to *Brown I* and *Brown II* be accomplished only by imposition of an Attainder upon so many whose only contribution to the wrongs sought to be alleviated by *Brown* derives from the circumstance of their birth? What will be the dimensions of such selective attainting of some, but not others, among the groups that make up our total society? See DeFunis v. Odegaard, Wash. 507 P.2d 1169 (1973). There a divided Supreme Court of the State of Washington held it proper to deny to a qualified student the right to study law at the State University, *solely because of his race.* This was done so that others of lesser qualifications, *but of a different race,* could be admitted to the law school.

We have set out above that the District Judge believed that in Chattanooga the schools had been desegregated and that a unitary system had been established. We have affirmed such holding. Mapp v. Board of Educ. of City of Chattanooga, 373 F.2d 75 (1967).

The District Judge then went on to say:

"This lawsuit has been in an area where the law has been evolving, and the Court cannot say that the defendants have acted in bad faith in failing always to perceive or anticipate that development of the law."

Must every School Board now be expected, clairvoyantly, to guess what new judicial device may be considered by a District Judge to be a better way of serving desegregation, and make fresh adjustments if such device is found permissible by some appellate court? Across the nation, especially in the cities, rapid population shifts have brought about new concentrations of racial groups. Must the courts be ready to move in with fresh commands and new rerouting of buses? The chaos that can be the result is forecast by Chief Justice Burger's language in *Swann.*

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; *but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools,* further intervention by a district court should not be necessary." (Emphasis added.) (402 U.S. at 31, 32, 91 S.Ct. at 1283, 1284.)

We must therefore consider the issues raised on appeal.

## I

## THE QUOTA SYSTEM

The District Court misconstrued recent decisions of the Supreme Court as requiring racial quotas in the public schools. It ordered "a racial ratio of not less than 30% nor more than 70% of any race in each elementary school within the system with but five exceptions . . . ." 329 F.Supp. 1374, 1382. The five schools excepted therefrom were found not to be imbalanced on account of past or present discrimi-

nation. Similar quotas were ordered for Junior High Schools. Senior High Schools are still under consideration.

In our opinion, the decision in Swann v. Charlotte-Mecklenburg Board of Educ., 402 U.S. 1, 91 S.Ct. 1267 (1971), on which the District Court relied, does not mandate the adoption of quotas in each and every school in the system regardless of where the children reside.

Mr. Chief Justice Burger, who wrote the opinion for the Court said:

"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." (402 U.S. at 24, 91 S.Ct. at 1280).

In Winston-Salem/Forsyth Bd. of Educ. v. Scott, 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971), in an Opinion in Chambers, Chief Justice Burger, after quoting the above language from *Swann*, stated:

"Nothing could be plainer, or so I had thought, than *Swann's* disapproval of the 71%–29% racial composition found in the *Swann* case as the controlling factor in the assignment of pupils, simply because that was the racial composition of the whole school system." (404 U.S. at 1228, 92 S.Ct. at 1240).

Chief Justice Burger further said:

"The present status of the findings is not clear to me, but the District Court on reconsideration following the remand seems to have thought that it was compelled to achieve a fixed racial balance reflecting the composition of the total county system. The explicit language of the Court's opinion in *Swann* suggests a possible confusion on this point. I do not attempt to construe that language, but simply to recite it verbatim: 'The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.' 402 U.S. at 24 [91 S.Ct., at 1280]." (404 U.S. at 1230–1231, 92 S.Ct. at 1241).

In Deal v. Cincinnati Bd. of Educ., 369 F.2d 55 (6th Cir. 1966), affirming 244 F.Supp. 572 (S.D.Ohio, 1965), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L. Ed.2d 114, we stated:

"Moreover, our refusal to restrict the school board with a mathematically certain formula for the vindication of individual constitutional rights is not an innovation. The right to a trial by an impartial, fairly selected jury, is well established in our law and it has been protected against the same sort of disguised racial discrimination that has been attempted in the school desegregation cases. Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Ex parte State of Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879); Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879).

However, it is equally clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which is to try him nor on the venire or jury roll from which petit jurors are to be chosen. Swain v. State of Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Akins v. State of Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). While the two situations may not be completely analogous, the potential dangers to a criminal defendant, forced to face a racially imbalanced jury, are at least as great as the intangible, often speculative injuries threatening a student in a racial-

ly imbalanced school." (369 F.2d at 61–62).

The trouble is that the quota system, which in our judgment is alien to a free country, has been extended to other fields and with discriminatory and disastrous results.[1]

We see no occasion for the District Judge to rely on the drastic order of Judge McMillan considered in *Swann, supra,* or that of Judge Merhige, reversed in *Bradley.*[2]

The District Court was obviously influenced by the fact that the Supreme Court in *Swann* affirmed a very broad order of District Judge McMillan. This appears from a colloquy between the Court and counsel for the Board, at the evidentiary hearing, as follows:[3]

"THE COURT: Well, what is your question about what they did? Did they or did they not approve all of the procedures that had been followed in the Mecklenburg case?

MR. WITT: They placed great—

THE COURT: Well, just answer my question, did they or did they not approve every single procedure followed in the Mecklenburg case.

MR. WITT: Yes.

THE COURT: So is there any question about what they did?

MR. WITT: Yes." (Tr. 1693–19–20)

But the Supreme Court in *Swann* pointed out the background of defiance by that Board which occasioned the broad order:

"As the voluminous record in this case shows, the predicate for the District Court's use of the 71%—29% ra-

tio was twofold: first, its express finding, approved by the Court of Appeals and not challenged here, that a dual school system had been maintained by the school authorities at least until 1969; second, its finding, also approved by the Court of Appeals, *that the school board had totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own, notwithstanding the patient efforts of the District Judge, who, on at least three occasions, urged the board to submit plans.*" (Emphasis added.) (Footnotes omitted) (402 U.S. at 24, 91 S.Ct. at 1280).

In our case, prior to the entry of the orders from which these appeals had been taken, no child was excluded from any school on account of color or race. The District Court found that the Board has acted in good faith and has at all times "complied or attempted to comply with the orders and directions of the Court." The Board was not in default. This distinguishes *Swann.*

The quota system results in the violation of the constitutional rights of innocent black children and white children in order to redress past violations of the constitutional rights of the plaintiffs. Both black and white children, without their consent or that of their parents, are forced by judicial fiat to be transported away from their homes and neighborhood schools to other strange places and schools, solely because of the color of their skin. These innocent children have committed no offense to justify such treatment.[4] Plaintiffs seem to recognize this fact because one of the assignments of error in their appeal was their claim that the District Court erred

---

1. Ross, "Why Quotas Won't Work," Reader's Digest, Feb. 1973, page 51: "Current effort to atone for past discrimination against minorities is creating new victims by reverse discrimination. Can two wrongs make a right?"

2. Bradley v. School Board of Richmond, 462 F.2d 1058 (4th Cir. 1972), affirmed by an equally divided court in —— U.S. ——, 93 S.Ct. 1952, 36 L.Ed.2d 771.

3. See 83 Harvard Law Review 81, 82.

4. Many black people opposed forced bussing of their children. At the National Black Political Convention, held in Gary, Indiana (March, 1972), mandatory bussing and school integration were condemned as racist and as preserving a black minority structure.

in ordering the closing of black schools without ordering a sufficient number of white schools closed. Plaintiffs' brief states:

> "Thus, black youngsters will be required to leave their neighborhoods to go to other schools for all grades or for grades 1–3 in numbers disproportionate to the numbers of blacks." (Plaintiff-Appellants' brief, p. 30).

There is no provision in the Constitution which can be read as saying that the races must be mixed in each and every school in the system, and no provision requiring that white children be bussed away from their neighborhood schools in the suburbs, to schools in the inner city, or that black children must be bussed away from their neighborhood schools to schools in the suburbs, in order to achieve a racial mixture or quota.

The Board can hardly be faulted for housing patterns of a community or for the concentration of blacks in the inner city, as these conditions exist in other cities throughout the country, regardless of the type of school system in operation, i. e., whether de jure or de facto.

In his book, "Negroes In Cities," Dr. Karl Taeuber states that residential segregation exists "regardless of the character of local laws and policies and regardless of other forms of discrimination." He said substantially the same thing in his article, "Residential Segregation," in the August, 1965 issue of Scientific American.

In Bradley v. School Board of City of Richmond, 462 F.2d 1058 at 1066 (4th Cir. 1972), cert. granted, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255, 1973, the Court said:

> "[T]he root causes of the concentration of blacks in the inner cities of America are simply not known . . . ."

And

> "Whatever the basic causes, it has not been school assignments, and

school assignments cannot reverse that trend."

It is, of course, popular to blame the Boards of Education for everything, but it is unfair to require the educational system to dismantle this condition for which it was in no wise responsible.

II

## UNITARY SCHOOL SYSTEM

Unlike the District Court, we have experienced difficulty in understanding not only what constitutes a unitary school system, but also what steps the Constitution requires must now be taken to eliminate a de jure system and to bring about a unitary system. Other Judges, legal scholars and writers have had similar difficulty.[5] We suggested in Northcross that the Supreme Court had not defined a unitary school system. Northcross v. Board of Educ. of Memphis, Tenn. City Schools, 420 F.2d 546 (6th Cir. 1969). We were corrected in a concurring opinion written by Chief Justice Burger, wherein he said:

> "The suggestion that the Court has not defined a unitary school system is not supportable. In *Alexander v. Holmes County Bd. of Educ., 396 U.S. 19 [90 S.Ct. 29, 24 L.Ed.2d 19] (1969), we stated, albeit perhaps too cryptically, that a unitary system was one 'within which no person is to be effectively excluded from any school because of race or color.'* " Northcross v. Bd. of Educ. of Memphis, Tenn., 397 U.S. 232 at 236–237, 90 S. Ct. 891, 893, 25 L.Ed.2d 246 (1970). (Emphasis added).

Under this definition the School Board already had achieved a unitary system long before the entry of the orders from which the appeals were taken. While this did not establish racial quotas, or a mixture in all of the schools as desired by plaintiffs, no pupil was excluded from any school on account of his color or race. This is all that Brown I and Brown II ever contemplated.[6]

5. 85 Harvard Law Review 3, 74, 76, 81, 83.

6. Brown I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

These decisions, in our judgment, did not envision the use of school children to bring about an integration of the races.

## III

## MAXIMIZING INTEGRATION

The District Court required the Board to establish that it had taken affirmative action to "maximize integration" in all feasible ways as required by *Kelley* [7] and *Robinson*.[8] The Supreme Court in Davis v. Board of School Comm'rs of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), held that "school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." (402 U.S. at 37, 91 S.Ct. at 1292). We have not found where the Supreme Court has ever required School Boards to "maximize integration". The difficulty is that the District Court may well have understood the words to require integration of the races by fixed numbers or quotas in each public school in the system, regardless of where the pupils live, and regardless of their economic circumstances. This can be accomplished only by extensive and expensive bussing and by violation of the constitutional rights of both races.

If it is desirable to integrate the races, why not start with adults, rather than to pick on defenseless school children? Of course, it would take an Act of Congress to compel adults to integrate. We doubt that Congress could ever be persuaded to pass such legislation, and if it were so persuaded, such law would clearly be unconstitutional in violation of the First Amendment which guarantees freedom of association. N. A. A. C. P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

In that case the Court denied enforcement of a state contempt citation against the petitioner, which citation was issued when petitioner refused to disclose its Alabama membership list. The adverse effect on the membership of disclosure of the roster of N.A.A.C.P. was, of course, somewhat speculative. Yet the Court held that the importance of the right of association was so great as to require protection, stating:

". . . [S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." (357 U.S., at 460–461, 78 S.Ct. at 1171).

This principle was reaffirmed in Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). The language in the concurrence of Mr. Justice Black and Mr. Justice Douglas, is instructive.

". . . [W]e believe, as we indicated in United States v. Rumely, 345 U.S. 41, 48, at 56, [73 S.Ct. 543, 547, at 550, 97 L.Ed. 770] (concurring opinion), that First Amendment rights are beyond abridgment either by legislation that directly restrains their exercise or by suppression or impairment through harassment, humiliation, or exposure by government. One of those rights, freedom of assembly, includes of course freedom of association; and it is entitled to no less protection than any other First Amendment right as N. A. A. C. P. v. State of Alabama, 357 U.S. 449, at 460, [78 S.Ct. 1163, at 1170, 2 L.Ed.2d 1488], and De Jonge v. Oregon, 299 U.S. 353, at 363, [57 S.Ct. 255, at 259, 81 L.Ed. 278], hold. These are principles applicable to *all* people under our Constitution irrespective of their race, color, politics, or religion." (Emphasis added) 361 U.S. at 528, 80 S.Ct. at 419.

"*All* people" includes children.

It should be pointed out that there is a marked difference between voluntary bussing and induced or forced bussing in the effect on the children involved and their parents. No one can have any objection to the school system's furnish-

---

7. Kelley v. Metropolitan County Bd. of Educ. of Nashville & Davidson County, 436 F.2d 856 (6th Cir. 1970).

8. Robinson v. Shelby County Bd. of Educ., 442 F.2d 255 (6th Cir. 1971).

ing voluntary transportation from the child's residence to the school nearest thereto. It is something entirely different when the child, solely because of the color of his skin, is assigned away from his neighborhood school, by a court order, and is required to be transported to another school (whether by his parents' car or by induced bussing) some distance away from his home.

*Brown I* speaks of the feeling-of-inferiority effect on children as the result of discriminatory state action where the children are not permitted to attend certain public schools because of the color of their skin. This condition would seem to persist still if children of both races are prohibited by court order from attending schools nearest to their residences, merely because of the color of their skin, and are required to be taken elsewhere to school.

## IV

### BURDEN OF PROOF

Where a dual system has been maintained, the courts have placed the burden of proof upon the School Board to establish that present racial imbalances in a particular school are not the result of past discriminatory actions, although the cases are not very clear as to just how or in what manner the Board can ever meet such a heavy burden. But in a case like ours, where the Board has always complied with the desegregation orders of the Court, and the plaintiffs have filed motions for further relief whenever new decisions have been announced expanding the rights of plaintiffs in school desegregation cases, it would seem to us to be only fair that plaintiffs should have the burden to prove that they are entitled to such further relief. The Board ought not to have the burden of disproving every contention which the plaintiffs may see fit to make in this case. In our judgment the Court erred in placing on the defendants the burden of proof in resisting plaintiffs' motion for further relief.

## V

### PRACTICALITIES

In considering desegregation plans the District Court must take into account the practicalities of the proposals. These include the cost thereof, how such proposals may affect the rights of the children involved in the assignments, induced bussing, and the educational achievement of such proposals.

Boards of Education do not have unlimited funds to adopt any program which they please. Funds can be raised by taxation and appropriation. In the present case the Board of Education does not have the power to levy taxes or to appropriate funds to carry out its programs. Only the Board of Commissioners of the City has such power and authority. That Board was not made a party to the case in the District Court until after the desegregation orders had been entered by the Court. We would assume that the Board of Commissioners has already appropriated the funds for the 1972–73 school year. If so, we do not know how an expenditure of $500,000 for buses would affect operation of the schools. The District Court has not ordered the Board of Commissioners to appropriate funds to provide for transportation of pupils, and we do not consider in this appeal the question whether it has the power to enter any such order. The Board of Commissioners is entitled, on remand, to a hearing on all issues of the case before any order is entered against it.

We would not affirm the District Court's opinions, but would remand for an evidentiary hearing to consider the changed circumstances and to proceed not inconsistent with this opinion.

The District Court also should consider Title VIII of the Education Amendments of 1972, and its prohibition against the use of funds appropriated by Congress for bussing.

In our judgment a quota system can discriminate invidiously in favor of one

race against other races. Such a system can lower the quality of education and educational achievement, and instead of bringing harmony and good will between the races can polarize them.