James Jonathan MAPP et al.,
Plaintiffs-Appellants,

v.

The BOARD OF EDUCATION OF the
CITY OF CHATTANOOGA, TEN-
NESSEE, et al., Defendants-Appellees.

James Jonathan MAPP et al.,
Plaintiffs-Appellees,

v.

The BOARD OF EDUCATION OF the
CITY OF CHATTANOOGA, TEN-
NESSEE, Defendant-Appellant.

Nos. 74–2100, 74–2101.

United States Court of Appeals,
Sixth Circuit.

Argued April 18, 1975.

Decided Oct. 20, 1975.

Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, Sylvia Drew, New York City, for James J. Mapp and others.

Raymond B. Witt, Jr., Witt, Gaither, Richardson, Henniss & Whitaker, Chattanooga, Tenn., for Bd. of Ed. and others.

Before WEICK, EDWARDS and EN-GEL, Circuit Judges.

ENGEL, Circuit Judge.

This desegregation case is once more before the court,[1] this time on cross-ap-

---

1. For previous decisions of this court in this litigation see *Mapp v. Board of Education of Chattanooga*, 295 F.2d 617 (6th Cir. 1961), 319 F.2d 571 (6th Cir. 1963), 373 F.2d 75 (6th Cir. 1967), 477 F.2d 851 (6th Cir. 1973), *cert. denied* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313.

peals from an order of the district court entered June 24, 1974. That order denied motions filed by both parties to modify or amend an earlier order of the court entered December 18, 1973, directed implementation of the final school desegregation plan previously approved by the court with certain modifications. The December 18, 1973 order provided as well that "[To] the extent the Court has previously given only tentative approval to the High School Zoning Plan, the same is now approved finally."

Both appeals in effect seek to relitigate all of those same issues which we decided in an en banc decision in this court, reported in *Mapp v. Board of Education of Chattanooga*, 477 F.2d 851 (6th Cir. 1973), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973). We there affirmed a final plan of desegregation in all respects except as to the high schools in Chattanooga.

While the district judge had at that time approved the plan as to Kirkman Technical High School, and our affirmance made the same final, District Judge Frank W. Wilson had given only tentative approval to the plan for desegregation for other high schools in the City of Chattanooga, see *Mapp v. Board of Education of Chattanooga*, 341 F.Supp. 193 (E.D.Tenn.1972), being uncertain particularly whether three rather than four general purpose high schools would be feasible or desirable in Chattanooga.

With respect to Judge Wilson's refusal to modify the previous final plan of desegregation, we find that he did not abuse his discretion in so doing, particularly since this court has given its approval of that plan.

■ Accordingly, we see as the sole issue remaining on this appeal the question of whether the district judge erred in ordering final approval of the tentative plan of desegregation for the Chattanooga high schools.

At the time the tentative plan was proposed, it was anticipated that the zoning for the four high schools would produce a racial balance approximately as follows:

|  | Black Students | White Students |
| --- | --- | --- |
| Brainerd High School | 32% | 68% |
| Chattanooga High School | 44% | 56% |
| Howard High School | 75% | 25% |
| Riverside High School | 75% | 25% |

When, however, the plan was placed into effect in the fall of 1971 rather than having the attendance anticipated, the four high schools experienced the following racial balance:

|  | Black Students | White Students |
| --- | --- | --- |
| Brainerd High School | 39% | 61% |
| Chattanooga High School | 43% | 57% |
| Howard High School | 99% | 1% |
| Riverside High School | 99% | 1% |

While an actual head count had showed that as late as July 1971 there were 393 (29%) white high school students in the Howard High School zone and 311 (29%) white students in the Riverside zone, only ten reported that September to Howard and three to Riverside.

It is the contention of the plaintiffs that a school board's duty in a previously dual and segregated school system cannot be said to have been performed where, after implementation of a plan of desegregation, such an imbalance in the racial mix of the students yet remains. After taking extensive testimony on this issue and on the other issues raised by the parties' motions to amend the earlier judgment, Judge Wilson, in his Memorandum Opinion of November 16, 1973, made the following findings of fact:

To the extent that the Court has previously given only tentative approval to the high school zoning plan, final approval will now be given that plan. Two high schools, Howard High School and Riverside High School, have not acquired an enrollment of white students as projected by the Board when the plan was proposed in 1971, but rather have remained substantially all black. It was a concern for the accuracy of these projections that caused the Court to initially give only tentative approval to the high

school zoning plan. However, subsequent evidence has now demonstrated that changing demographic conditions within the City and other *de facto* conditions beyond the control and responsibility of the School Board, including the voluntary withdrawal of white students from the system, have become the causative factors for the present racial composition of the student body in those schools and not the original action of the Board in creating segregated schools at these locations. It should be recalled in this connection that the plan previously approved included provision for students to elect to transfer from a school in which they were in a majority to a school in which they would be in a minority.

While the cause of the departure of white students was disputed, there can be little doubt upon the record that the difference between the anticipated mix and the actual attendance of the high schools when the plan was put into effect was due to a substantial departure of white students from the public schools in Chattanooga, a circumstance which the district judge found to have occurred beyond the control and responsibility of the School Board.

No one who firmly believes in the social and educational value of racial balance in a desegregated school system can help being seriously concerned when such a plan for achieving racial balance does not achieve its objectives on implementation. That such a concern was shared by the district judge is manifest throughout the entire record upon appeal. Nevertheless, the district judge concluded that the demographic changes in the city itself were the cause of the remaining imbalance, a finding which finds support in the record and which we hold is not clearly erroneous.

We are satisfied that, in giving final approval to the high school desegregation plan, Judge Wilson was by no means yielding to irrational concerns over white flight which merely masked inherent Board resistance to integration. To the contrary, he carried out the plan in spite of the apprehended result, and beyond that resisted the defendant Board's further efforts to modify the earlier approved plan for the remainder of the system with this language in his November 27, 1973 opinion:

"The Court is not unsympathetic to the concern expressed by the Board for minimizing the voluntary departure of white students from the system. It must be apparent, however, that this objective cannot serve as a limiting factor on the constitutional requirement of equal protection of the laws, nor as a justification for retaining *de jure* segregation. Concern over 'white flight', as the phenomenon was often referred to in the record, cannot become the higher value at the expense of rendering equal protection of the laws the lower value. As stated by the United States Supreme Court in the case of *Monroe v. Board of Commissioners*, 391 U.S. 450 [88 S.Ct. 1700, 20 L.Ed.2d 733]. . . . :

'We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. "But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of the disagreement with them." *Brown II* [*Brown v. Board of Education of Topeka II*] [349 U.S. 294] at 300 [75 S.Ct. 753, 99 L.Ed. 1083], . . .

"Moreover, it is the 'effective disestablishment of a dual racially segregated school system' that is required, *Wright v. Council of City of Emporia*, 407 U.S. 451 [92 S.Ct. 2196, 33 L.Ed.2d 51] . . . not, as seems to be contended by the defendants, the most 'effective' level of voluntarily acceptable 'mixing' of the races." (Footnote omitted)

■ Having implemented the plan for desegregating the high schools by establishing zones for attendances which were designed to achieve a high degree of racial balance throughout the system, and

having provided further for continuance of a majority-to-minority transfer policy, the district judge conceived that he had obeyed the mandate of *Brown v. Board of Education of Topeka II*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*) and more particularly of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). So do we. Presumably, the district judge might have ordered a further realignment when the first plan did not achieve the proper balance ratio, and yet another if that did not hold. Indeed if such were found to have been required to carry out the constitutional mandate to eliminate the vestiges of a dual system, it would simply have to be done, and we have no doubt the district judge would faithfully have carried out that duty. What he was finally faced with here, however, was rather a more subtle and lingering malaise of fear and bias in the private sector which persisted after curative action had been taken to eliminate the dual system itself. *Swann v. Board of Education* recognizes that this latter may be beyond the effective reach of the Equal Protection Clause:

> "Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools."

*Swann v. Board of Education, supra*, 402 U.S. at 23, 91 S.Ct. at 1279.

Affirmed.

EDWARDS, Circuit Judge (dissenting).

This appeal presents just one significant question: Should we now, under applicable Supreme Court precedent, affirm the District Judge's final order of December 18, 1973, approving a final desegregation order applicable to the Chattanooga high schools?

With all respect for the sincerity of my colleagues, I cannot join the majority opinion, or approve its result. If the majority opinion prevails in this court and in the Supreme Court, it will establish as law the proposition that approximately 60% of the black children in the high schools of the Chattanooga public school system may be continued forever in complete racial segregation in all black schools which were built as such under state law which required a racially dual school system and which have been continuously segregated as such down to this very moment. I cannot square this proposition with the great command of the Fourteenth Amendment to provide all American citizens "the equal protection of the laws."

The rule of this case is all the more significant because the smaller numbers, the maturity, and the greater mobility of high school students tend to make practical accomplishment of high school desegregation the least difficult part of the task mandated by *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

The in banc per curiam opinion of the Sixth Circuit (*Mapp v. Board of Education of the City of Chattanooga, Tennessee*, 477 F.2d 851 (6th Cir.), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973)) constituted unqualified approval of two previously entered opinions and judgments of Judge Wilson, *Mapp v. Board of Education of the City of Chattanooga*, 329 F.Supp. 1374 (E.D.Tenn. 1971); *Mapp v. Board of Education of the City of Chattanooga*, 341 F.Supp. 193 (E.D.Tenn.1972). In these two cases Judge Wilson had approved final desegregation orders concerning the grade schools and junior high schools. Equally clearly, he had not approved any final desegregation plan for the high schools.

As to the high schools, in his first opinion he said:

### High Schools

During the school year 1970–71, the Chattanooga School System operated five high schools. These included four general curricula high schools and one technical high school. Kirkman Technical High School offers a specialized curricula in the technical and vocational field and is the only school of its kind in the system. It draws its students from all areas of the City and is open to all students in the City on a wholly non-discriminatory basis pursuant to prior orders of this Court. Last year Kirkman Technical High School had an enrollment of 1218 students, of which 129 were black and 1089 were white. The relatively low enrollment of black students was due in part to the fact that Howard High School and Riverside High School, both of which were all black high schools last year, offered many of the same technical and vocational courses as were offered at Kirkman. Under the defendants' plan these programs will be concentrated at Kirkman with the result that the enrollment at Kirkman is expected to rise to 1646 students, with a racial composition of 45% black students and 55% white students. No issue exists in the case but that Kirkman Technical High School is a specialized school, that it is fully desegregated, and that it is a unitary school.

While some variation in the curricula exists, the remaining four high schools, City High School, Brainerd High School, Howard High School, and Riverside High School, each offer a similar general high school curriculum. At the time when a dual school system was operated by the School Board, City High School and Brainerd High School were operated as white schools and Howard High School and Riverside High School were operated as black schools. At that time the black high schools were zoned, but the white high schools were not. When the dual school system was abolished by order of the Court in 1962, the defendants proposed and the Court approved a freedom of choice plan with regard to the high schools. The plan accomplished some desegregation of the former white high schools, with City having 141 black students out of an enrollment of 1435 and Brainerd having 184 black students out of an enrollment of 1344 during the 1970–71 school year. However, both Howard, with an enrollment of 1313, and Riverside, with an enrollment of 1057, remained all black. The freedom of choice plan "having failed to undo segregation * * * freedom of choice must be held unacceptable." *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

The School Board proposes to accomplish a unitary school system within the high schools by zoning the four general curricula high schools with the following results in terms of student ratios:

| | Black Students | White Students |
|---|---|---|
| Brainerd High School | 32% | 68% |
| Chattanooga High School | 44% | 56% |
| Howard High School | 75% | 25% |
| Riverside High School | 75% | 25% |

The plaintiffs have interposed objections to the defendants' high school plan upon the ground that it does not achieve a racial balance in each school. To some extent these objections are based upon matters of educational policy rather than legal requirements. It is of course apparent that the former white high schools, particularly Brainerd High School, remain predominantly white and that the former black high schools remain predominantly black. However, the defendants offer some evidence in support of the burden cast upon them to justify the remaining imbalance. The need for tying the high school zones to feeder junior high schools is part of the defendants' explanation. Residential patterns, natural geographical features, arterial highways, and other factors are also part of the defendants' explanation.

A matter that has given concern to the Court, however, and which the Court

feels is not adequately covered in the present record, is the extent to which the statistical data upon which the defendants' plan is based will correspond with actual experience. Among other matters there appears to be substantial unused capacity in one or more of the city high schools. Before the Court can properly evaluate the reliability of the statistical data regarding the high schools, the Court needs to know whether the unused capacity does in fact exist and, if so, where it exists, whether it will be used and, if so, how it will be used. It would be unfortunate indeed if experience shortly proved the statistical data inadequate and inaccurate and this Court was deprived of the opportunity of considering those matters until on some appellate remand, as occurred in the recent case of *Davis v. Board of School Commissioners of Mobile*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577.

The plaintiff has submitted a high school plan with high school zones which the plaintiff's witness has testified will achieve a racial balance in each high school. However, this plan is not tied into the junior high school plan hereinabove approved and the Court is unable to say whether it could be so tied in. Furthermore, the same statistical problem discussed above would appear to exist with regard to the plaintiff's plan.

The Court accordingly is unable to give final approval to a high school desegregation plan at this time. Time, however, is a pressing factor. Pre-school activities will commence at each high school within less than a week, if in fact they have not already commenced. Full commencement of the fall term is only one month away. It is clear that the high schools must move at least as far as is proposed in the defendants' high school plan. Accordingly, the Court will give tentative approval only at this time to the defendants' high school plan in order that at least as much as is therein proposed may be placed into operation at the commencement of the September 1971 term of school. Further prompt but orderly judicial proceedings must en-

sue before the Court can decide upon a final plan for desegregation of the high schools.

In the meanwhile, the defendants will be required to promptly provide the Court with information upon the student capacity of each of the four high schools under discussion, upon the amount of unused space in each of the four high schools, the suitability of such space for use in high school programs, and the proposed use to be made of such space, if any. In this connection the defendants should likewise advise the Court regarding its plan as to tuition students. Last year almost one-third of the total student body at City High School were nonresident tuition paying students. There is no information in the present record as to the extent the Board proposes to admit tuition students nor the effect this might have on the racial composition of the student body. The Court has no disapproval of the admission of tuition students nor to the giving of preference to senior students in this regard, provided that the same does not materially and unfavorably distort the student racial ratios in the respective schools. Otherwise, the matter of admitting tuition students addresses itself solely to the discretion of the Board. No later than the 10th day of enrollment the defendants will provide the Court with actual enrollment data upon each of the four high schools here under discussion.

*Mapp v. Board of Education of the City of Chattanooga, supra* at 1384–86.

In his second opinion he said:

Tentative approval only having heretofore been given to the School Board plan for desegregation of the Chattanooga high schools other than Kirkman Technical High School (to which final approval has been given). Further consideration must be given to this phase of the plan. At the time that the Court gave its tentative approval to the high school desegregation plan, the Court desired additional information from the Board of Education as to whether three, rather than four, general purpose high schools

would be feasible or desirable in Chattanooga. It now appears, and in this both parties are in agreement, that three general purpose high schools rather than four is not feasible or desirable, at least for the present school year. Having resolved this matter to the satisfaction of the Court, the defendant Board of Education will accordingly submit a further report on or before June 15, 1972, in which they either demonstrate that any racial imbalance remaining in the four general purpose high schools is not the result of "present or past discriminatory action on their part" *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 26, 91 S.Ct. at 1281, 28 L.Ed.2d 554 at 572, or otherwise, and to the extent that the Board is unable to demonstrate that such racial imbalance which remains is not the result of past or present discriminatory action, they should submit a further plan for removal of all such remaining racial discrimination, the further plan likewise to be submitted on or before June 15, 1972.

*Mapp v. Board of Education of the City of Chattanooga, supra* at 200.

The opinion and order we now review are quite different, and if approved by this Court and the Supreme Court, would represent both a final approval of the school board's current "plan" for operation of the high schools and holding that the present operation represents desegregation of the previously legally segregated dual high school system.

In the opinion we now review Judge Wilson said:

The Court is accordingly of the opinion that the defendants have failed to establish either such changed conditions as would render its formerly court-approved plan of school desegregation inadequate or improper to remove "all remaining vestiges of state imposed segregation" or that its newly proposed plan would accomplish that result.

To the extent that the Court has previously given only tentative approval to the high school zoning plan, final approval will now be given that plan. Two high schools, Howard High School and Riverside High School, have not acquired an enrollment of white students as projected by the Board when the plan was proposed in 1971, but rather have remained substantially all black. It was a concern for the accuracy of these projections that caused the Court to initially give only tentative approval to the high school zoning plan. However, subsequent evidence has now demonstrated that changing demographic conditions within the City and other *de facto* conditions beyond the control and responsibility of the School Board, including the voluntary withdrawal of white students from the system, have become the causative factors for the present racial composition of the student body in those schools and not the original action of the Board in creating segregated schools at these locations. It should be recalled in this connection that the plan previously approved included provision for students to elect to transfer from a school in which they were in a majority to a school in which they would be in a minority.

*Mapp v. Board of Education of the City of Chattanooga*, 366 F.Supp. 1257, 1260–61 (E.D.Tenn.1973).

Thus, clearly, we now have before us the issue as to whether or not in the Chattanooga high schools previous unconstitutional segregation has been eliminated "root and branch." *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

Defendants-appellees accept (as they must) the responsibility of meeting the standard of *Green v. County School Board of Kent County, supra* :

It is against this background that 13 years after *Brown II* commanded the abolition of dual systems we must measure the effectiveness of respondent School Board's "freedom-of-choice" plan to achieve that end. The

School Board contends that it has fully discharged its obligation by adopting a plan by which every student, regardless of race, may "freely" choose the school he will attend. The Board attempts to cast the issue in its broadest form by arguing that its "freedom-of-choice" plan may be faulted only by reading the Fourteenth Amendment as universally requiring "compulsory integration," a reading it insists the wording of the Amendment will not support. But that argument ignores the thrust of *Brown II*. In the light of the command of that case, what is involved here is the question whether the Board has achieved the "racially nondiscriminatory school system" *Brown II* held must be effectuated in order to remedy the established unconstitutional deficiencies of its segregated system. In the context of the state-imposed segregated pattern of long standing, the fact that in 1965 the Board opened the doors of the former "white" school to Negro children and of the "Negro" school to white children merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system. *Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch. See *Cooper v. Aaron, supra* [358 U.S. 1] at 7 [78 S.Ct. 1401, 3 L.Ed.2d 5]; *Bradley v. School Board,* 382 U.S. 103 [86 S.Ct. 224, 15 L.Ed.2d 187]; cf. *Watson v. City of Memphis,* 373 U.S. 526 [83 S.Ct. 1314, 10 L.Ed.2d 529]. The constitutional rights of Negro school children articulated in *Brown I* permit no less than this; and

it was to this end that *Brown II* commanded school boards to bend their efforts.[4]

[4] "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154 [85 S.Ct. 817, 822, 13 L.Ed.2d 709]. Compare the remedies discussed in, *e. g., NLRB v. Newport News Shipbuilding & Dry Dock Co.,* 308 U.S. 241 [60 S.Ct. 203, 84 L.Ed. 219]; *United States v. Crescent Amusement Co.,* 323 U.S. 173 [65 S.Ct. 254, 89 L.Ed. 160]; *Standard Oil Co. v. United States,* 221 U.S. 1 [31 S.Ct. 502, 34 L.R.A.,N.S., 834, 55 L.Ed. 619]. See also *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 232–234 [84 S.Ct. 1226, 1233–1235, 12 L.Ed.2d 256].

In determining whether respondent School Board met that command by adopting its "freedom-of-choice" plan, it is relevant that this first step did not come until some 11 years after *Brown I* was decided and 10 years after *Brown II* directed the making of a "prompt and reasonable start." This deliberate perpetuation of the unconstitutional dual system can only have compounded the harm of such a system. Such delays are no longer tolerable, for "the governing constitutional principles no longer bear the imprint of newly enunciated doctrine." *Watson v. City of Memphis, supra* [373 U.S.] at 529 [83 S.Ct. [1314] at 1316]; see *Bradley v. School Board [City of Richmond, Va.], supra; Rogers v. Paul,* 382 U.S. 198 [86 S.Ct. 358, 15 L.Ed.2d 265]. Moreover, a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. "The time for mere 'deliberate speed' has run out," *Griffin v. County School Board [of Prince Edward County],* 377 U.S. 218, 234 [84 S.Ct. 1226, 1235, 12 L.Ed.2d 256], "the context in which we must interpret and apply this language [of *Brown II*] to plans for desegregation has been significantly altered." *Goss v. Board of Education [of City of Knoxville,*

*Tenn.]*, 373 U.S. 683, 689 [83 S.Ct. 1405, 1409, 10 L.Ed.2d 632]. See *Calhoun v. Latimer*, 377 U.S. 263 [84 S.Ct. 1235, 12 L.Ed.2d 288]. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.

*Green v. County School Board of New Kent County, supra* at 437–39, 88 S.Ct. at 1693.

At the outset we note that we deal with a school district which at the time of the beginning of this litigation was clearly and concededly a dual school system segregated by race according to state statute. We therefore are required to determine whether or not a public high school system (racially constituted during the 1973–74 school year as follows) can be held by this court to have been desegregated "root and branch":

|  | White | Black | % White | % Black |
|---|---|---|---|---|
| Howard | 10 | 999 | 1 | 99 |
| Riverside | 3 | 721 | 1 | 99 |
| Chattanooga | 439 | 330 | 57 | 43 |
| Brainerd | 646 | 404 | 61 | 39 |

There can, of course, be no doubt that Howard and Riverside High Schools are "racially separate public schools established and maintained by state action." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 5, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971). Both were built as Negro schools under state law which required a dual school system. T.C.A. §§ 2377, 2393.9 (Williams 1934). Twenty-one years after decision of *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), both high schools (encompassing 60% of the black high school population of Chattanooga) are still (and always have been) essentially 100% black. As to these schools and students, there has been no desegregation at all.

Defendants-appellees contend that two measures which they took should be accepted as the·equivalent of desegregation. They are: 1) the inauguration of a freedom of choice plan, and 2) a change in zone boundaries which was calculated (it is claimed) to introduce 25% of white students into both high schools. Defendants-appellees freely admit that neither measure was effective in changing the segregated character of the Howard and Riverside High Schools.

As to the freedom of choice plans, the Supreme Court has repeatedly held that ineffective freedom of choice plans are not a substitute for desegregation in fact. *See Green v. County School Board of New Kent County, supra; Monroe v. Board of Commissioners of the City of Jackson*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

Defendants-appellees' strongest reliance is upon the second contention that they "zoned" 25% white students into Howard and Riverside but that the white students thus assigned avoided the assignment by "white-flight." As to this measure, we have no findings of fact concerning defendants-appellees' contention. But if we assumed their truth, we clearly would not have exhausted the possibilities for successful desegregation nor satisfied the constitutional command. Many possibilities for desegregation remain, including pairing of white and black schools and high school construction which would make desegregated zones more feasible. In any instance, the defendant school board should be required to propose a new and realistic plan to meet its constitutional duty. *See Swann v. Charlotte-Mecklenburg Board of Education, supra*, 402 U.S. at 15–21, 91 S.Ct. 1267; *Brinkman v. Gilligan*, 518 F.2d 853 (6th Cir. 1975).

In my judgment the case should be affirmed as to the grade schools and junior high schools. The judgment should be vacated and remanded as to the high schools. All other issues presented by either party should be summarily denied.