**James Jonathan MAPP et al., Plaintiffs,**

v.

**The BOARD OF EDUCATION OF the CITY OF CHATTANOOGA, TENNESSEE, et al., Defendants.**

**Civ. A. No. 3564.**

United States District Court, E. D. Tennessee, S. D.

Nov. 16, 1973.

Raymond B. Witt, Jr., John T. Henniss, W. Frank Brown III, Chattanooga, Tenn., for Board of Ed. of City of Chattanooga, Tenn.

## OPINION

FRANK W. WILSON, Chief Judge.

In 1971 this Court approved a plan submitted by the Chattanooga School Board designed to accomplish the final desegregation of that City's school system and to remove all vestiges of the dual school system formerly operated within the City. See Mapp v. Board of Education of the City of Chattanooga, et al., 329 F.Supp. 1374 (D.C.1971) and 341 F.Supp. 193 (D.C.1972). Compulsory implementation of the plan was delayed pending appellate review, with the result that the School Board has only partially implemented the plan to date.

The United States Court of Appeals, sitting *en banc*, has now affirmed the decision of this Court. *See* Mapp v. Board of Education of the City of Chattanooga, et al., 477 F.2d 851 (6th Cir. 1973). The defendants filed a petition for *certiorari* seeking review of the Court of Appeals decision, but that petition was recently denied by the United States Supreme Court, —— U.S. ——, 94 S.Ct. 445, 38 L.Ed.2d 313.

In the meanwhile, and following the decision of the Court of Appeals affirming the final plan of school desegregation approved by this Court, the School Board filed a petition with this Court contending that since 1971 there have been changed circumstances in the Chattanooga School System necessitating a new hearing and warranting extensive revisions in the 1971 plan. Hearings extending over a period of seven trial days have now been held in which evidence was received regarding the changed conditions that are alleged to have occurred since 1971 and regarding a new and extensively revised plan for school desegregation.

The substance of the evidence submitted by the defendants with regard to changed conditions is that there has been a decline in school enrollment over the years which has accelerated in recent years, with much the greater portion of that decline in recent years having occurred in the white students enrolled in the system and with a ratio of black students in the system having increased from 48.8% in the 1970–71 school year to 58.2% in the current year (See Ex. 1, § 1, p. 1). Although acknowledging that there has been an increase in the ratio of black students to white students in the system each year since at least 1945, long before school desegregation was a factor, the defendants attribute the recent enrollment losses and changes in racial ratios to partial implementation and threatened full implementation of the school desegregation plan heretofore approved. Contending that their experience indicates that schools having more than 35% black student enrollment tend to lose their white student enrollment rather rapidly, the substance of the defendants' proposed plan is to so revise the Court-approved plan as to maintain a majority of from 60–80% white students in formerly white schools. This result is to be accomplished by increasing the number of all-black schools or substantially all-black schools.

As a constitutional justification for the recent plan, the Board would have the Court interpret the constitutional mandate of the Equal Protection Clause as requiring a "mixing" of the races and the maintenance of a "viable racial mix" or a "stable racial mix".

 The difficulty with the Board's entire position, simply stated, is that it is based upon a mistaken legal premise. The "mixing" of races is not the constitutional mandate. The constitutional mandate is the equal protection of the law. The constitutional mandate, as stated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) and as applied by this Court in 1971 and as affirmed by the Court of Appeals in 1973, is that the City of Chattanooga and its Board of Education must eliminate "all vestiges of state imposed segregation," that is, it must remove all vestiges of the dual school system it formerly operated as a matter of law. This Court has no discretion, prerogative, authority or intention of deviating from that standard unless the standard itself is altered by higher authority. No plan of school desegregation can pass constitutional muster unless it is demonstrated that it does remove all residual consequences attributable to the fact that the system was once *designed, built, located, structured* and *operated* as a dual school system, that is, a system having as its specific purpose not the furtherance of education, but the furtherance of segregated education.

 The plan submitted by the Board and approved by the Court in 1971 was addressed to this problem and remedied the constitutional defects remaining in the system. The School Board's new proposal would largely disregard the constitutional mandate and address itself to another issue and that is how to maintain a "stable racial mix" in the system. This is the same issue to which Dr. Stolee, the plaintiffs' witness, addressed himself in his testimony in 1971. He proposed that it be accomplished by having a racial balance in each school, with the incidental effect of providing a white majority in most schools. The School Board now proposes that a "stable racial mix" be accomplished by retaining a sufficient number of all-black or substantially all-black schools so as to assure a white majority in a number of formerly or presently white schools. While it may be debatable whether Dr. Stolee's plan or any other plan would maintain for long a "stable racial mix" within a school or within a system, his plan, if adopted by the School Board, would not have been constitutionally impermissible. The Court declined to order its adoption, however, as a racial balance is not constitutionally mandated.

Upon the other hand, the School Board's present plan not only gives no greater assurance of a "stable racial mix" than did Dr. Stolee's, but it substantially ignores the constitutional mandate of removing all vestiges of its former dual system of schools. Furthermore, to maintain its white majority schools, as an inducement for white students not to voluntarily withdraw, it would require year by year adjustment of the plan, presumably *ad infinitum*. Under such a plan, it would appear that the possibility of achieving a unitary school system could never occur until all demographic change ceased, an unlikely event in an urban society where for years the affluence of the City of Chattanooga, like other cities, has been constantly receding to the suburbs. Annexation, and not resegregation of the schools, is the obvious answer to this loss of affluence as well as a declining residential population and a declining school enrollment. It should be noted in this regard that next year, as a consequence of recent annexations, the Chattanooga Public Schools will have an all time high student enrollment as well as again having a majority of white students.

█ The Court is not unsympathetic to the concern expressed by the Board for minimizing the voluntary departure of white students from the system. It must be apparent, however, that this objective cannot serve as a limiting factor on the constitutional requirement of equal protection of the laws, nor as a justification for retaining *de jure* segre-

gation. Concern over "white flight", as the phenomenon was often referred to in the record, cannot become the higher value at the expense of rendering equal protection of the laws the lower value. As stated by the United States Supreme Court in the case of Monroe v. Board of Commissioners, 391 U.S. 450, at 459, 88 S.Ct. 1700, at 1705, 20 L.Ed.2d 733 at 739:

> "We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of the disagreement with them.' *Brown II* [Brown v. Board of Education, 349 U.S. 294] at 300 [75 S.Ct. 753, at 756] 99 L.Ed. [1083] at 1106."

██ Moreover, it is the "effective disestablishment of a dual racially segregated school system" that is required, Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51, not, as seems to be contended by the defendants, the most "effective" level of voluntarily acceptable "mixing" of the races.[1]

█ The Court is accordingly of the opinion that the defendants have failed to establish either such changed conditions as would render its formerly court-approved plan of school desegregation inadequate or improper to remove "all remaining vestiges of state imposed

---

1. It is clear that under the present state of the law the authority of this Court is limited to the elimination of "state imposed segregation," that is, segregation imposed by law or by authority of law. And yet the entire weight of the defendants' present case is cast upon its concern over "white flight", a *de facto* form of segregation. Concern over this *de facto* form of segregation is urged upon the Court as justification for not proceeding to a full elimination of *de jure* segregation as provided for in the plan heretofore approved by this Court and affirmed upon appeal. In this connection the defendants cite the separate opinion of Justice

Powell in the Denver school case, Keyes v. School District # 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), wherein Justice Powell urges the elimination of the distinction between *de facto* and *de jure* segregation (a position concurred in by Justice Douglas). Suffice it to say that Justice Powell is clearly stating, in this regard, a minority or dissenting view. It is not clear to this Court how the Equal Protection Clause of the Fourteenth Amendment could be read as applying to anything other than state action, which this Court deems to be *de jure* action.

segregation" or that its newly proposed plan would accomplish that result.

To the extent that the Court has previously given only tentative approval to the high school zoning plan, final approval will now be given that plan. Two high schools, Howard High School and Riverside High School, have not acquired an enrollment of white students as projected by the Board when the plan was proposed in 1971, but rather have remained substantially all black. It was a concern for the accuracy of these projections that caused the Court to initially give only tentative approval to the high school zoning plan. However, subsequent evidence has now demonstrated that changing demographic conditions within the City and other *de facto* conditions beyond the control and responsibility of the School Board, including the voluntary withdrawal of white students from the system, have become the causative factors for the present racial composition of the student body in those schools and not the original action of the Board in creating segregated schools at these locations. It should be recalled in this connection that the plan previously approved included provision for students to elect to transfer from a school in which they were in a majority to a school in which they would be in a minority.

■ The plan previously approved by the Court will be modified to the following extent:

(1) The Hillcrest Elementary School, admitted to the school system by annexation since the former plan of school desegregation was approved, and having a 13% black student enrollment, will be continued with its presently established attendance zones;

(2) The inclusion of annexed area 10(d) in the Elbert Long Elementary School attendance zone will be approved; and

(3) The Board may at any time effect changes in school attendance zones under the following circumstances: (a) where such changes are administrative in nature and involve no transfers of pupils; (b) where such changes do not serve to further increase the majority racial ratio in any school affected thereby; (c) where such changes involve the alteration of school attendance zones to include contiguous annexed areas; and (d) where school attendance zones are created wholly within newly annexed areas. Notice of the change of any school attendance zones as provided by this paragraph shall be filed in this cause not less than 30 days before the change will take effect.

The previous decisions and orders of this Court having been affirmed on appeal and the appellate review having been completed, the stay heretofore granted pending appeal will be set aside. It further appears from the testimony given upon the recent trial of this cause that the defendants are prepared to promptly effect implementation of the final school desegregation plan herein approved. Such implementation shall be effected no later than the commencement of the midyear school semester.

A final order will enter in accordance with this opinion.