James Jonathan MAPP, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY OF CHATTANOOGA, TENNESSEE, et al., Defendants.

Civ. A. No. 3564.

United States District Court, E.D. Tennessee, S.D.

March 12, 1986.

Richard Dinkins and Avon N. Williams, Jr., Nashville, Tenn., and Lowell Johnston, NAACP Legal Defense & Educational Fund, New York City, for plaintiffs.

Raymond B. Witt, Jr., Eugene N. Collins & Associates, Chattanooga, Tenn., for defendants.

## MEMORANDUM

EDGAR, District Judge.

This school desegregation suit is now nearly 26 years old. After extensive litigation the Chattanooga Board of Education, at the direction of the Court, adopted an amended desegregation plan (herein the "Plan") on June 16, 1971. The goal of this Plan was to eliminate from the Chattanooga public schools all vestiges of state-imposed segregation and to create a unitary school system in which racial discrimination would be eliminated root and branch.

On July 26, 1971, this Court, through The Honorable Frank W. Wilson, held that the contents of the Plan reached the desired goal with respect to the City's elementary and junior high schools. *Mapp v. Board of Education of City of Chattanooga, Tennessee*, 329 F.Supp. 1374 (E.D.Tenn.1971). This ruling was upheld on appeal by the United States Court of Appeals for the Sixth Circuit. 477 F.2d 851, *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973). On November 16, 1973, Judge Wilson placed the Court's imprimatur on the Plan as it applied to Chattanooga's high schools. 366 F.Supp. 1257. This decision was also upheld on appeal by the Sixth Circuit. 525 F.2d 169 (1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3199, 49 L.Ed.2d 1203

(1976). On August 2, 1974, then Chattanooga Superintendent of Schools James W. Henry filed an affidavit with the Court asserting that the school system was in compliance with the Court's orders as embodied in the Plan. On April 20, 1976, the District Court issued its final order on the mandate from the Sixth Circuit. At that point the Plan portrayed a school system which was unitary and in which all vestiges of state-imposed segregation had been eliminated.

Judge Wilson in his 1973 opinion and accompanying order had modified the Plan in part as follows:

> The Board may at any time effect changes in school attendance zones under the following circumstances: (a) where such changes are administrative in nature and involve no transfer of pupils; (b) where such changes do not serve to further increase the majority racial ratio in any school affected thereby; (c) where such changes involve the alteration of school attendance zones to include continuous annexed areas; and (d) where school attendance zones are created wholly within newly annexed areas. Notice of the change of any school attendance zones as provided by this paragraph shall be filed in this cause not less than 30 days before the change will take effect. 366 F.Supp. at 1261.

Since that time, the City of Chattanooga has annexed additional territory, and the defendant Board of Education has filed a number of reports with the Court with respect to zone changes and other developments affecting schools in accordance with the Court's instructions. These zone changes and reports referred to matters impacting Chattanooga public schools located both in and out of newly annexed areas.

On July 16, 1979, the plaintiffs filed a "motion for further relief" in opposition to the Board's establishment of a school for academics at Brainerd High School. On August 10, 1983, the plaintiffs filed an amended motion for further relief seeking to reverse the Board's decision to close Riverside High School. On October 23,

1984, the defendants filed a motion for relief from final judgment seeking the dismissal of this suit. Since none of these motions had been acted upon, the Court on May 21, 1985, ordered an evidentiary hearing which would be confined to the following issues and which would necessarily be determinative of the various pending motions:

1. Whether the defendants have implemented the Plan of the Chattanooga Board of Education which received final approval by Judge Frank W. Wilson by order entered April 20, 1976.

2. Whether the Chattanooga Board of Education has, by any action taken by it since April 20, 1976, reestablished any vestiges of a dual school system.

This hearing was held on October 28, 29, 30 and 31, 1985, and with respect to the above issues, this Court makes the determinations that appear below.

## I. IMPLEMENTATION OF THE PLAN

Without serious question the Court finds that the Board did in fact implement all aspects of the Plan which had received court approval—except in the area of desegregation of faculty and staff. Paragraph V of the Plan, which addresses the faculty and staff issue, provides in its entirety that:

## V. DESEGREGATION OF FACULTY AND OTHER STAFF

In order to implement a quality educational program for all the school children attending Chattanooga Public Schools consistent with the guidelines set forth by the District Court of the United Stated [sic], the Board of Education proposes the following course of action.

A. Effective at the beginning of the 1971–72 school year, the principals, teachers, teacher aides, and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended

for black students or white students. The system shall assign the staff described above so that the approximate ratio of black to white teachers in each school, and the ratio of other staff in each, is substantially the same as each such approximate ratio is to the teachers and other staff, respectively, in the entire school system as of the tenth day of the 1970–71 school year. Teachers shall be assigned on the basis of certification and qualification for the academic subjects or grade levels to be taught.

The school system shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

B. Following implementation of Step 1, staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin. All courses of action pertaining to hiring, assigning, promoting, paying, demoting, and dismissing are subject to existing Tennessee law, State School Board Regulations, and local ordinances.

C. If there is to be a reduction in the number of principals, teachers, teacher aides, or other professional staff employed by the school system which will result in a dismissal or demotion of any such staff member, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable nondiscriminatory standards from among all the staff of the school system. In addition, if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member regardless of race who is qualified has had an opportunity to fill the va-

cancy and has failed to accept an offer to do so.

As related to staff reduction, the school board will adhere to nonracial and objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be stated as administrative procedures and/or Board policy, thereby becoming a matter of public record. The school system also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

Demotion as used above includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period.

Promotion includes any reassignment (1) under which the staff member receives more pay or more responsibility than under the assignment he held previously, or (2) which requires a greater degree of skill than did the assignment he held previously.

The purpose of this plan is to provide a method by which the staffs of each of the schools shall be desegregated in approximately the same ratio as black teachers and white teachers in the total system. It is the intent of the Board of Education through this plan for staff desegregation to remove racial identity as a result of teacher assignments in schools while in all instances effecting reassignments through objective administrative procedures.

Within the framework of commitments to implement total staff desegregation, specific procedures will be developed internally by the system's administrative

staff and will be approved and periodically reviewed by the Board of Education.

In 1971–72 the Board, in accordance with paragraph V, subparagraph A, *supra,* did transfer faculty and staff so that each school had the approximate ratio of black and white teachers as the ratio of black and white ratios in the entire school system. Since that time, however, the Board has apparently not felt constrained to maintain anything approximating that ratio. In making faculty and staff assignments within the school system, the school administration utilizes, in addition to race, a number of factors including whether the faculty/staff person will be able to work with children and parents; leadership ability; ability to work under pressure; and the degree of acceptance that it is perceived the assignee will have in the community. Nonetheless, it is clear that by 1982, and also in 1985, the racial identity of schools of the Chattanooga system was to a significant extent mirrored in the racial composition of the faculty and staff.

In 1982, 40.7% of the faculty and staff in the school system was black. In schools which were "racially identifiable" [1] as black schools by the racial makeup of their students, the faculty and staff was in most cases well in excess of 40.7% black. Some of the more extreme examples are:

| | Students | Faculty |
|---|---|---|
| Garber Elementary | 99% black | 71% black |
| Howard High School | 99% black | 73% black |
| Brainerd Junior High School | 78% black | 74% black |

On the other hand, those schools which were racially identifiable as white schools had low percentages of black faculty and staff. Examples are:

| | Students | Faculty |
|---|---|---|
| DuPont Elementary | 3% black | 21% black |
| Hixson High School | 1% black | 17% black |
| Hixson Junior High School | 1% black | 15% black |

Very generally the faculty for racially identifiable black schools in 1982 was two to three times as black as the faculty of white schools. The same pattern holds true for 1985. In general, racially identifiable black schools have a racially identifiable black faculty and staff. Racially identifiable white schools have a racially identifiable white faculty and staff.

 The language in the Plan complies with the guidance which had been provided in such cases as *Green v. School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), which directed school boards to take affirmative steps to eliminate dual school systems, and *Swann v. Charlotte-Mecklenberg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), wherein the Supreme Court said that:

> In *Green,* we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the

1. Plaintiff's expert, Dr. Gordon Foster, defined "racially identifiable" black schools as those schools which had 15% more black students than the percentage black enrollment in the entire school system. For example, in 1982, the system's black enrollment at the elementary level was 49.6%. Therefore, schools with a student population of over 64.6% black were racially identifiable black schools. Schools which had an enrollment of black students in an amount less than 15% under the system's percentage black enrollment were racially identifiable white schools. Therefore, schools with a student population of under 34.6% black were racially identifiable white schools. The figure for the systemwide black enrollment varied slightly from 1982 to 1985 and between elementary schools and secondary schools.

most important indicia of a segregated system. 391 U.S. at 435, [88 S.Ct. at 1692] 20 L.Ed.2d at 722. Independent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown. 402 U.S. at 18, 91 S.Ct. at 1277.

Courts have consistently required school systems to take affirmative steps to assign faculty and staff to dismantle dual school systems. It is not, for example, constitutionally permissible to leave the placement decisions of the faculty to the voluntary choice of the teachers. *Monroe v. Board of Commissioners, City of Jackson, Tennessee,* 380 F.2d 955, 961 (6th Cir.1967), *vacated on other grounds,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). Faculty-staff assignment provisions very similar to those contained in the Chattanooga Plan have been approved by the United States Supreme Court. *United States v. Montgomery County Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); *Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). Such provisions have also been approved by other federal courts. *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969), *reversed on other grounds,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970), including other district courts in the State of Tennessee. *Robinson v. Shelby County Board of Education,* 311 F.Supp. 97 (W.D.Tenn.1970), *remanded on other grounds,* 442 F.2d 255 (1971); *Kelley v. Metropolitan County Board of Education,* 317 F.Supp. 980 (M.D.Tenn.1970). It is clear that the Plan, as it relates to desegregation of faculty and staff, is entirely appropriate.

School Board officials testified that they interpreted the Court-approved Chattanooga Plan as not requiring an effort to maintain the faculty-staff ratio after the 1971–72 school year. The Board buttresses this interpretation by pointing to the following language in subparagraph B of paragraph V of the Plan:

> B. Following implementation of Step 1, staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

■ This Court cannot agree that this language relieves the Board of its responsibility to desegregate faculty and staff by maintaining the ratio called for by the Plan. The racial composition of faculty and staff has been an important part of the Chattanooga school desegregation effort for a long time. In 1967, this Court was ordered to hold hearings on this very subject and to include faculty-staff desegregation as a part of any plan of desegregation. 373 F.2d 75, 76 (6th Cir.). In formulating the Plan, the Board itself stated in the first paragraph of the Plan that it was following guidelines specified by various Supreme Court decisions which addressed this issue. *See, e.g., Green,* 391 U.S. 430, 88 S.Ct. at 1689; *Swann,* 402 U.S. 1, 91 S.Ct. at 1267; *Montgomery County,* 395 U.S. 225, 89 S.Ct. 1670. The Honorable Frank W. Wilson, in approving the faculty-staff portion of the Plan, stated that:

> The defendants' plan for desegregation of faculty and other staff as contained in paragraph V provides for the assignment of teachers and staff to each school in ratio to their existence within the system and in a manner so as to avoid any racial identification of one school from another. 329 F.Supp. at 1387.

There is certainly no indication in any of the above cases or from the history of this case that once the Plan's faculty-staff ratio has been achieved, it may be forgotten.

The interpretation of the Plan's language which the Board now urges loses sight of the undeniable goal of the Plan—that the faculty and staff of each school be desegre-

gated in approximately the same ratio as black to white teachers and staff in the system as a whole. The Board is not prohibited by the Plan after 1971–72 from using race as a factor in assigning faculty and staff to positions in the Chattanooga system. To the contrary, the Board is required to use race as a factor in assigning faculty and staff if that is what it takes to reach the goal.

█ Clearly the racial composition of faculty and staff was considered by this Court to be a vestige of the previously existing dual school system. It is equally clear that the faculty/staff ratio requirement was intended to eliminate that vestige. This Court cannot approve of the Board allowing that vestige to be restored after eliminating it only for a short period of time. This Court holds, therefore, that the Board has not fully implemented paragraph V of the Plan dealing with desegregation of faculty and other staff.

█ The Court emphasizes that there is no reason why the Board may not use factors other than race in making faculty-staff assignments. On the other hand, it is obvious that race must be given a higher priority in making these assignments than, for example, the factor of whether the surrounding community is ready to accept teachers of any particular race. *See Dayton Board of Education v. Brinkman,* 443 U.S. 526, 539 n. 11, 99 S.Ct. 2971, 2980 n. 11, 61 L.Ed.2d 720 (1979). As the above cited cases point out, this kind of affirmative action is not only sanctioned but is compelled where, as in Chattanooga, a dual school system formerly existed.

The Plan does not call for any precise numerical quotas or percentages. Furthermore, the Plan does not specify any particular bright line test for determining whether a school is "racially identifiable" by virtue of its faculty and staff. Neither does the Plan require that a predominately black school have a white principal, or vice versa. However, the Plan does require that the faculty and staff of all schools be desegregated in *approximately* the same ratio as black and white teachers in the total sys-

tem. The Board has clearly not achieved this result, nor has it, at least since 1972, made a sufficient enough effort.

The Court acknowledges that Dr. James W. Henry, Superintendent James McCullough, Dr. Clifford Hendrix and Commissioner John Franklin all testified that in their opinion the Board had complied fully with the Plan. The Court deems those opinions to be honestly and sincerely held, and this Court does not attribute to any of these individuals nor to the Board any discriminatory intent. The Court is nonetheless compelled to examine the facts. From those facts, it is apparent to the Court that the Plan has not been implemented, except perhaps for a brief period, with respect to the assignment of faculty and staff.

The school administration, under the supervision of Dr. Clifford Hendrix, a black, makes a special effort to recruit black teachers with mixed success. For example, in 1985, only 15 of 100 applicants for teaching positions in the Chattanooga city school system were black. There is evidence that the Chattanooga school system has experienced difficulty in hiring qualified black teachers. However, this difficulty does not excuse the system from properly distributing those black and white teachers and staff that it has among the schools in accordance with the ratio of black to white faculty and staff in the system as a whole.

█ The question arises as to whether the Plan's affirmative action requirements for faculty-staff assignments applies to schools in the annexed areas, as well as to schools which were in the system when the Plan was formulated. There is no evidence of there ever having been a constitutional violation with respect to the annexed area schools. Nevertheless, these schools are now a part of the Chattanooga public school system. Moreover, by requiring notices of changes in attendance zones in annexed areas, Judge Wilson obviously contemplated that annexed schools would be considered a part of the system subject to the orders of this Court. 366 F.Supp.

1257, 1261. While the Board may not be able to exercise control over demographic factors which result, with reference to student enrollment, in "racially identifiable" schools, the Board nevertheless is in a position to directly control assignment of faculty and staff throughout the entire system. Therefore, the faculty-assignment portion of the Plan applies to all existing Chattanooga public schools including those located in areas which have been annexed since the formulation of the Plan.

This Court does not pass upon the wisdom of the faculty/staff ratio requirement. However, the ratio is required by the Equal Protection Clause of the Fourteenth Amendment; it is a part of the Chattanooga Plan; and it has not been fully implemented by the Board.

## II. REESTABLISHMENT OF VESTIGES

■ The second issue before the Court is whether the Board has, by any action taken by it since April 20, 1976, reestablished any vestiges of a dual school system. The effect of the implementation of ·the Plan was, with the exception of faculty/staff assignments, to establish a unitary school system in compliance with equal protection. Since the constitutional violation embodied in the formerly existing dual school system has been remedied, the burden now rests with the plaintiffs to prove that any Board action taken since 1976 was taken in violation of the Constitution. *Riddick v. School Board of the City of Norfolk,* 784 F.2d 521 (4th Cir.1986). To establish a constitutional violation (*i.e.,* a "vestige"), plaintiffs must prove "not only that segregated schooling exists but also that it was brought about by intentional state action." *Keyes v. School District No. 1,* 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973). Proof of a new equal protection violation requires proof of an intent to discriminate. *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976); *Ar-*

*lington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

■ Since the preparation of, and subsequent court approval of, the Plan, the City of Chattanooga has annexed additional territory. Additional school zones have consequently been added to the Board's jurisdiction including, of course, the schools which go with those zones. These schools were formerly owned and operated by Hamilton County, Tennessee. There is no proof in the record that these annexed schools were ever part of a dual school system, nor that any constitutional violation has ever been found with respect to these schools. Therefore, before this Court can find an equal protection violation in the annexed areas, plaintiffs must carry the burden of proving that any segregation is caused by intentional state action. *Keyes,* 413 U.S. at 198, 93 S.Ct. at 2692.

Plaintiffs' central contention is that Board action or inaction since 1976, both inside the original city school system and within the annexed area, has resulted in patterns of segregation and that, therefore, the Board has been guilty of constitutional violations in several specified ways.[2] The Court will deal with the plaintiffs' contentions seriatim.

### A. *Faculty and Administrative Assignments*

■ Plaintiffs point to the trend which has developed since 1981 away from the goal specified by the Plan that the staff of each school be desegregated in approximately the same ratio as black teachers and white teachers in the total system. As stated earlier in this opinion, the Court views this as a failure by the Board to implement the Plan, and not as segregation intentionally caused by the Board subsequent to the approval and implementation of the Plan.

---

**2.** Actually the plaintiffs contend that there are vestiges of the old dual Chattanooga school system that have never been eliminated. As stated earlier, the Court rejects this contention, with

the exception of faculty/staff distribution. Hence, the Court will examine whether Board action, or inaction, since 1976 resulted in segregation intentionally caused by the Board.

### B. Annexation

Since Court approval of the Plan, the City of Chattanooga has annexed a considerable amount of additional geographical territory. The annexed area, of course, included a number of schools, the majority of which had predominately white student bodies because the areas annexed were inhabited primarily by whites. Plaintiffs contend that since a number of the annexed schools are still racially identifiable as white schools, it follows that the Board has intentionally caused segregation. This Court disagrees. In the first instance, the statistics do not support plaintiffs' contention that the Chattanooga school system is more "segregated" today than it was when the Plan was adopted. Today, 18 annexed schools are still in existence. All of these schools under plaintiffs' definition would have been classified as racially identifiably white when they entered the system. Only 13 of these schools would be so classified in 1985. Moreover, the percentage of schools which could be identified under plaintiffs' criteria as either white or black schools has actually dropped since the adoption of the Plan and even in the face of the annexation. This is reflected in the following chart:

| Year | Total Number Of Schools | Black Schools | White Schools | Percentage Of Schools Either Black or White |
|------|-------------------------|---------------|---------------|---------------------------------------------|
| 1972 | 46 | 18 | 23 | 89% |
| 1975 | 59 | 26 | 18 | 74% |
| 1982 | 57 | 25 | 16 | 71% |
| 1985 | 54 | 24 | 15 | 72% |

Thus, the Court finds that when the Plan was formulated and approved the Chattanooga system had a higher percentage of "racially identifiable" schools that it does today. In any event these statistics, which were adduced by the plaintiffs, do not reveal the development of any greater degree of segregation since 1976, much less any intent on the Board to bring it about. The Court also notes that the Chattanooga City Commission, not the Board, initiated the annexation. There is no evidence in the record which would justify a conclusion that the racial makeup of the schools had anything to do with the decision of the City to annex adjacent areas. Thus, the Court finds no intent to discriminate related to annexation.

### C. School Construction

It has been recognized that school construction can be used to perpetrate or reestablish a dual school system. *Swann* 402 U.S. at 21, 91 S.Ct. at 1278-79. The Board, though, has only constructed one new school since 1976, Big Ridge Elementary. Plaintiffs contend that the construction of Big Ridge in the northeastern part of the annexed area served to perpetuate segregation since most of its students are white. Plaintiffs suggest that a better racial mix could have been achieved by locating the school some considerable distance away from its present location—and across the Tennessee River.

The Board contends, and the Court finds, that the Big Ridge site was selected because population statistics supported it. There was a need to relieve the pressure on other schools in the area, which was rapidly growing in population. Since it had been well known that the City planned to annex this area, Hamilton County had not constructed any schools here. The County did not want to build a new school only to have it swallowed up by the City. As a result, the City found itself in possession of an area with a growing population and in need of a school. There is no evidence of any discrimination by the Board in the construction of Big Ridge Elementary. Before this school was constructed, a report was duly filed with the Court. The Court records do not reveal any complaint or protest having

been made by the plaintiffs concerning this until the evidentiary hearing conducted in October, 1985.

### D. School Closings

Since 1976 it has become necessary for the Board to close eight Chattanooga city schools. The administrative and economic advantages flowing from these closures is not questioned by the plaintiffs. When these schools were closed, the students had to be assigned to other schools. Plaintiffs contend that the pupil reassignments made in connection with four of these closings exacerbated patterns of segregation and reenforced vestiges of the former dual school system. Plaintiffs contend that the reassignments could have been made to have fewer discriminatory results. The Court will deal with each of the contested school closings and pupil reassignments.

### 1. Smith Elementary—

This elementary school was closed at the end of the 1984–85 school year. At the time of its closing, the school's pupils were 87% black. The pupils were reassigned (rezoned) to Normal Park Elementary, Henry Elementary, and G.R. Brown Elementary. As a result, Normal Park went from 53% black to 68% black, Henry went from 67% black to 71% black, and Brown went from 44% black to 43% black. The zones for Normal Park, Henry and Brown were all contiguous to the Smith zone.

Plaintiffs' expert contended that the Board should have assigned Smith pupils to non-contiguous school zones such as Rivermont and DuPont, all of which are located a considerably greater distance from Smith than were Normal Park, Henry and Brown. Superintendent James McCullough testified that there had been no space for additional students at Rivermont, DuPont or the other schools suggested by the plaintiffs. He also pointed out that transfers to these other more distant schools would require the establishment of non-contiguous attendance zones, a feature that is not a part of the currently approved Plan. McCullough also observed that the increase in the percentage of black students at Normal Park was the result not so much of the addition of black pupils, but was caused by the loss of white pupils, something which had not been anticipated.

■■■ The net effect of this Board action was to eliminate an 87% black school (Smith). These students were placed in zones which did not require transportation of students to non-contiguous zones. Of the three schools to which Smith's pupils were sent, there was a significant effect only on Normal Park—and this effect was not anticipated by the Board. The Court can perceive no discriminatory intent on the Board's part as a result of the Smith closure and pupil assignments connected therewith.

### 2. Carpenter Elementary and Pineville Elementary—

■■■ Both of these schools were closed at the end of the 1980–81 school year. Carpenter was 97% black, and Pineville was 77% black. The pupils were rezoned to other contiguous school zones. The schools to which these pupils assigned were, with one exception, racially identifiable black schools, and they remain racially identifiable black schools. The exception was Rivermont Elementary. Part of the Carpenter students were zoned to Rivermont. This reassignment apparently had no effect upon the racial composition of that school which was 11% before and after the Carpenter closure. Plaintiffs contend that "a more sensible desegregative alternative" would have been to reassign the Carpenter students perhaps to DuPont Elementary, a non-contiguous zoned school some considerable distance away. Superintendent McCullough testified that no space was available at DuPont at that time. Plaintiffs assert that Pineville students should have been sent to Mountain Creek, a mostly white school, with the result being more desegregative. However, the Court finds no discriminatory intent by the Board with respect to these school closings and pupil reassignments.

### 3. *Riverside High School—*

■ This school was closed at the end of the 1982–83 school year. Riverside's student population, 99% black, had lost enrollment to the point that the Board found it very costly to operate and to provide the necessary academic subjects. Riverside's zone was combined with that of nearby Howard High School, also 99% black. Before the merger of Riverside and Howard, Riverside had 286 pupils and Howard 534. After the merger, Howard had 715 pupils. Some of the students in the newly created zone went to Kirkman High School, which is a citywide zoned school. A small number took advantage of a majority to minority transfer provision in the Plan and transferred to other high schools in the city.

■ Plaintiffs contend that Riverside students should have been zoned with Chattanooga City High School or Lookout Valley High School, and that the Board's action served to further "racially isolate Howard." The Board says that it chose to combine Riverside with Howard because Howard was nearby and had the space. While discriminatory impact may be evidence of discriminatory intent, the Court can find no discriminatory impact upon Howard High School which was already 99% black—much less any discriminatory intent by the Board in these actions. The closure of one race schools such as Riverside is indeed a desegregative objective. *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281.

The Riverside High School buildings are now planned for use by the Board to establish a Paidea School which will be a magnet school open to selected students with appropriate academic records citywide. The opening of this school should have a desegregative effect upon the school system. The result will be the replacement of a 99% black school with a school having a more racially balanced student enrollment.

Plaintiffs have no criticism of the other four school closings that the Board has made. At least one of these, the closing and reassignment of students at Elbert Long Junior High School had, the plaintiffs concede, a desegregative effect.

### E. *Course Offerings*

■ Plaintiffs made some effort to show that course offerings at predominately white schools were more extensive than those at predominately black schools by comparing the courses at Hixson High with those at Howard High. While there are some differences in the courses at these two schools, and while it apparently is true that Hixson offers ROTC whereas Howard does not, this Court cannot conclude that this in any way evidences proof of discriminatory intent on the part of the Board. Plaintiffs' expert conceded as much.

### III. CONCLUSION

When the Board's plan was approved in 1971 and 1973 by Judge Wilson, there existed within the system a number of "racially identifiable" schools. Judge Wilson used a 30%—70% guideline. He concluded as to those schools which fell outside the 30%—70% guideline that the Board had

> carried the burden of establishing that such racial imbalance as may remain is not the result of present or past discrimination on the part of the Board or other state agency. Rather, such limited racial imbalance as may remain is the consequence of demographical, residential, or other factors which in no reasonable sense could be attributed to school board action or inaction, past or present, nor to that of any other state agency. 329 F.Supp. at 1383.

This Court reaches that same conclusion today with respect to those portions of the system which are "racially identifiable." The Constitution required the elimination of the Chattanooga dual school system. This goal, with the exception of faculty assignments, was accomplished. Even where the Board had the burden of proof, Judge Wilson nevertheless concluded that the "mixing" of races was not a constitutional mandate. 366 F.Supp. 1257, 1259. Here, where the plaintiffs bear the burden of proving intentional discrimination, it is even more clear that the plaintiffs have not

carried that burden by their contentions that some more acceptable racial mix could have been achieved in the assignment of pupils. 366 F.Supp. 1257, 1261.

The Court finds that there is, with the exception of faculty/staff assignments, no constitutional violation in the current composition and operation of the Chattanooga city school system. The Board has not reestablished any vestiges of a dual system. None of the actions which it has taken since the approval and implementation of the Plan are the result of an intent to discriminate.

The plaintiffs seek a court order directing the Board to submit yet another plan remedying the "concerns" which they have raised. Without saying so directly, plaintiffs' criticisms of the Board's pupil assignments must be translated into a request for additional busing beyond that which is already being done under the current Plan.

 However, absent a constitutional violation, this Court has no power to order further relief to counteract resegregation that does not result from the school system's intentionally discriminatory acts. *Vaughns v. Board of Education of Prince Georges County,* 758 F.2d 983, 988 (4th Cir.1985); *Riddick* at pp. 536–537. Otherwise, this Court would be placed in the position of having to closely regulate racial imbalances, a procedure frowned upon by the United States Supreme Court. *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 434–35, 96 S.Ct. 2697, 2703–04, 49 L.Ed.2d 599 (1976); *Swann,* 402 U.S. at 32, 91 S.Ct. at 1284. Where a school system has eradicated all vestiges of de jure segregation the school boards, and not the federal courts, should run the schools absent an intent to discriminate. *Riddick,* at p. 543.

Plaintiffs' amended motion for further relief, which contested the establishment by the Board of a magnet school for academics at Brainerd High School and which sought to reverse the decision of the Board to close Riverside High School will be DENIED. Both of these actions were, if any-

thing, desegregative in effect, and evince no evidence of intentional discrimination.

 The defendant Board's motion for relief from final judgment will also be DENIED. The Board will be directed to take further steps to desegregate faculty and staff in accordance with paragraph V of the Plan.

This Court will retain jurisdiction until it is satisfied that paragraph V of the Plan has been implemented. To this end, the Board is directed to submit a report to this Court on or before October 1, 1986, which will enable the Court to ascertain whether the faculty and staff in each school is in approximately the same ratio as the racial composition of the faculty and staff in the system as a whole.

This case has been pending in this Court too long. A school desegregation case is certainly a special kind of case. However, there is no reason why it must remain pending forever. *Pasadena,* 427 U.S. at 441, 96 S.Ct. at 2707. When the Board has implemented paragraph V of the Plan, this Court will entertain a motion for a lifting of the Court's order and dismissal of this case. However, in the meantime, this case will remain in its present posture, and the Board is to take the necessary steps to more fully desegregate its faculty and staff in accordance herewith.

An appropriate order will enter.

### ORDER

Pursuant to the memorandum filed herewith, plaintiffs' amended motion for further relief is hereby DENIED. The defendants' motion for relief from final judgment is likewise DENIED.

The Chattanooga Board of Education is hereby ORDERED to take the necessary steps to desegregate its faculty and staff in accordance with paragraph V of the amended desegregation plan adopted June 16, 1971, to the end that the faculty and staff of each of the Chattanooga City Schools shall be desegregated in approximately the same ratio as black teachers and white teachers in the total system.

The Chattanooga Board of Education is directed to submit a report to this Court on or before October 1, 1986, on its progress in this regard.

SO ORDERED.